**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Horton R. PRUDDEN, Defendant-Appellee.**

**No. 28140.**

United States Court of Appeals, Fifth Circuit.

April 10, 1970.

Rehearing Denied and Rehearing En Banc Denied June 26, 1970.

Samuel S. Forman, Asst. U. S. Atty., Jacksonville, Fla., Johnnie M. Walters, Asst. Atty. Gen., Joseph M. Howard, John M. Brant, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., John L. Briggs, U. S. Atty., Middle District of Florida, for plaintiff-appellant.

C. Harris Dittmar, Chester Bedell, Charles P. Pillans, Jacksonville, Fla., for defendant-appellee; Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, Fla., of counsel.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Horton R. Prudden was indicted on seventeen counts of evading taxes due the United States. On taxpayer's motion made prior to trial, the court below in a blanket order suppressed all statements made and all corporate and personal documents furnished by Prudden to a special agent of the Internal Revenue Service, together with all evidence obtained through or as a result of such statements or documentary evidence. Suppression was based on a finding that the Internal Revenue Service had obtained such statements and documents by engaging in a deliberate scheme to deceive Prudden in order to prevent his understanding that an investigation originally commenced by a revenue agent had materially altered at the time the special agent entered the case.[1] The United States chose to appeal the suppression order rather than to proceed to trial without the evidence thus suppressed. Since the record does not clearly and convincingly demonstrate a deliberate scheme to deceive and we reject the taxpayer's contention that he was entitled to *Miranda* warnings, we reverse.

The following facts are either undisputed or are stated most favorably to the taxpayer. On May 10, 1963, certain returns of The Florida Corporation of America (FCA) and its subsidiaries were assigned to Revenue Agent Lexow for the purpose of determining the correctness of the tax reported. At this time Lexow had been with the Internal Revenue Service about one year—he was still in training and was not a full-grade agent. Prudden was 50 years of age, a law school graduate and then employed as a security analyst for a member firm of the New York Stock Exchange. After learning that FCA was to be examined, Prudden telephoned Lexow at the Palm Beach office of the Internal Revenue Service from his home in Connecticut, stating that he was a director of FCA. He inquired if Lexow's examination was to cover FCA alone or its subsidiaries also and further asked if the examination was routine. Lexow replied that the examination would cover both FCA and

1. 305 F.Supp. 110 (M.D.Fla.1969).

its subsidiaries and that it was not routine; that the returns had been selected in Jacksonville to be examined and had been assigned to Lexow from there.

The examination actually commenced on May 31 when Lexow contacted Mrs. Anne G. Smith, who was indicated on the returns to be the president of these corporations.[2] All of Lexow's subsequent examinations were made under the supervision of Mrs. Smith either with or without Prudden present. Prudden and Mrs. Smith were cooperative with Agent Lexow, furnishing him most of the documents he wished to examine and making copies for him at his request. By June 17 Lexow's examinations had disclosed what he considered to be possible indications of fraud. It appeared to Lexow that a Nassau based corporation, Research and Development, Ltd., might be skimming profits off one of FCA's subsidiaries. He further noted there was no indication as required on the return, that the Bahamian and American corporations were related. Lexow had also discovered information concerning a sale of stock which gave the appearance of having produced a large capital gain, but had been reported as a loss. By this time Lexow's investigation had also broadened to cover Prudden's personal returns. Lexow made no report of these suspicions to his superiors at this juncture because he wanted to pursue the examination further.

A number of times during Lexow's audit Prudden told him that if they found anything wrong, he, Prudden, wished that Lexow would let him know so that it could be corrected and any tax due could be paid. Prudden was particularly insistent that Lexow advise him on how to handle several details of a particular stock sale. Lexow testified that it was possible that he did tell Prudden that when all the facts were known to him he would advise Prudden how a 52,000 dollar escrow item connected with the stock sale should be handled, but Prudden admits he never got this advice.

When a revenue agent discovers indicia of fraud in the course of an examination, the routine procedure requires that he refer a complete report of his findings to the Intelligence Division of the revenue service, which then determines whether it will assign a special agent to take charge of the case. On June 27, while Lexow's examination was continuing, he had his first discussions with other persons in his office about the possibility of referring the case to the Intelligence Division. Lexow began to write his referral report on July 3 and completed it on July 15. On July 9 he wrote Prudden requesting bank statements and canceled checks of Research and Development, Ltd., urging him to forward these documents to Lexow in order to save time and enable Lexow to proceed with his examination of FCA and its subsidiaries. He also complimented Prudden on his cooperation. A copy of this letter is set out in the margin.[3] It was not shown that Prudden ever furnished the documents requested to Lexow or his successors.

Lexow did not meet with Prudden or Mrs. Smith after July 9. On August 14, Lexow received advice from the Intelligence Division that it had decided to

---

2. Prudden testified that Mrs. Smith had merely been a statistician and at the time of these examinations she was not a corporate officer but was acting as an independent agent on an hourly pay basis. The ownership of substantially all the FCA stock was held in trusts, of which Prudden was co-trustee for his sons.

3. "Dear Mr. Prudden:
    I presume that you have retrieved from storage the bank statements and canceled checks of Research and Development, Ltd.'s two bank accounts.

Please forward them to me in care of this office. By doing so, we will both benefit in that you will be saved a considerable amount of time upon your return to Florida and prior to your return, I will be able to proceed with my examination of F C A and subsidiaries.
    You have been most cooperative in furnishing information and in giving of your time in connection with this examination; therefore, I feel sure that you will give your immediate attention to this matter.
                        Sincerely,"

make a full-scale investigation. On August 29, after a telephone conversation with Mrs. Smith indicated that Prudden wanted a written request, Lexow wrote Prudden requesting that copies be made available to him of papers previously furnished but inadvertently left in the corporation's office. He also asked for a schedule which computed losses incurred from acts of an unfaithful employee. In this letter Lexow advised Prudden that he was being transferred at his own request, to an assignment that would permit him to return to college, and that Agent Lewis E. Stanley was to become the agent on the case. Lexow's letter requested Prudden to continue to cooperate with Agent Stanley. A copy of this letter is set out in the margin.[4] On the date of this letter Lexow knew that Special Agent Edward M. Cohen was then in charge of the Prudden investigation, but his name was not mentioned to Prudden or Mrs. Smith.[5]

In several instances, Prudden refused to give Lexow requested documents which Prudden felt were outside the proper scope of Lexow's examination. Lexow once told Prudden that the Internal Revenue Service would never leave him alone until he produced some records for Research and Development, Ltd. Prudden took the position that such records did not have to be produced and, as stated, he never produced them. On one occasion when Lexow raised a question as to constructive ownership with Prudden, Prudden told Lexow not to attempt to tell him about the rules of constructive ownership, that that subject had been his specialty in law school and he had studied it for three years. On several occasions Prudden told Lexow that he, Lexow, was simply on a fishing expedition—trying only to gather facts that would support Lexow's preconceived conclusions. In his final letter to Lexow, Prudden stated that he was left with the impression that items were being singled out of context in order to attack his intentions as unfair and not forthright. He pointed out that he had frequently asked for the Internal Revenue Service's views but had never received a stable answer of any kind. He further offered to review with Agent Stanley "whatever context he may wish to go over," expressly including the summary of losses sustained due to activities of the unfaithful employee, which Lexow had previously requested.

On September 13, 1963, Revenue Agent Lewis E. Stanley wrote Prudden confirming a meeting on October 1, 1963 in Palm Beach. Although the letter did not mention him, Special Agent Cohen intended to and did meet with Prudden and Stanley. When Cohen and Stanley

4. "Dear Mr. Prudden:
    Before you left on the 9th of August you made copies of some papers for me which I left in your office by mistake. I would appreciate it if you would have your secretary, Mrs. Smith, make them available to me. It is necessary that I have them to properly verify your returns. The copies were of the following three items: 1) a note from H. B. Bradford, CPA advising you on the proper way to handle costs relative to the sale of 1st S. E. stock which were incurred after the sale; 2) a list of 1st S. E. subsidiaries with addresses and locations; and 3) your letter to Kent, re: $52,800.00 escrowed money (it is not absolutely necessary that I have this).
    A fourth item which I need but failed to ask for during your last visit is a copy of the schedule you recently prepared showing a computation of the Palmer Fidelity loss.

    At my request the Government is moving me to our Ocala, Florida office, in order that my wife and I can take advantage of the educational facilities at the University of Florida. Your return along with the others under examination are being transferred to Agent Lewis E. Stanley of this office. Please address all future correspondence to him.
    You have been most cooperative in this examination to date, I trust that you will extend the same courtesy to Agent Stanley.

                        Sincerely."

5. Lexow testified that the information was sought to make his final report on the matter complete and that he did not withhold the disclosure of Cohen's assignment because of any fear such disclosure would cut off the flow of information.

opened the meeting they identified themselves to Prudden as a special agent and a revenue agent respectively, and showed him their written credentials, which he examined. Cohen's credentials plainly carried the legend "Intelligence Division". Prudden testified that he did not know the significance of Cohen's designation as a special agent. They informed Prudden that they were there to make an audit and examination of his returns, the returns of his three sons and the returns of FCA and its eight subsidiaries. He was also told that the examination would include any other corporation or gift tax returns that he had filed. Neither Stanley nor Cohen ever stated to Prudden that a criminal investigation was being conducted or that the investigation they were making was being made to determine the possibility of fraud. Prudden was never given any warning nor was he ever advised that he had a right to remain silent or that any information furnished by him could be used against him in any subsequent proceedings. All actions and procedures followed by Stanley and Cohen were in accord with what was then the Internal Revenue Service's standard procedure in such cases.

On December 21, 1964, Revenue Agent Stanley and Special Agent Cohen interviewed Prudden at the Internal Revenue Service Intelligence Division office. Prudden answered the questions asked him but refused to allow the conversation to be recorded. All other meetings between Prudden and the IRS agents were at Prudden's office at his convenience during regular business hours. The work of Special Agent Cohen and Agent Stanley extended over a period of some fifteen months. Prudden persisted in refusing records of the Bahamian corporation and records outside the years he felt were properly open. He continued to complain that the agents were fishing and criticized third-party investigations, but he also continued to cooperate within these limits with the agents' requests for information and records during the entire period.

### I. NECESSARY WARNINGS AND ADVICE

Prudden contends that the evidence obtained after Special Agent Cohen entered the investigation must be suppressed because he, Prudden, was not warned and advised of his rights according to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[6] We adhere to our prior rulings and reject this contention. However, the Supreme Court's ruling in Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) reversing this court and holding that routine tax investigations are not immune from the *Miranda* requirements for warnings to be given to a person in custody, and two recent decisions from the Seventh Circuit which reach a result contrary to ours here,[7] indicate that we make a detailed review of this issue.

6. Although the evidence in question was obtained prior to the decision in *Miranda*, the Supreme Court applied that decision to persons whose trials had not begun as of June 13, 1966, regardless of when the alleged constitutional infirmity occurred. Johnson v. New Jersey, 384 U.S. 719, 734, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882 (1966). In Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969), the Court limited the retroactivity of the rule by refusing to apply it to retrials commenced after the date of the decision even though the original trial preceded *Miranda*. It is appropriate to here note that the District Court was under the impression that Prudden did not rely on *Miranda* and the order suppressing evidence was expressly declared to be independent of any application of *Miranda* to the instant case. The constitutional dimensions of that rule and the fact that this cause must be remanded for further proceedings where the point might be raised, indicate that we should rule on it now.

7. United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969), and United States v. Habig, 413 F.2d 1108 (7th Cir. 1969), cert. den., 396 U.S. 1014, 90 S.Ct. 559, 24 L.Ed.2d 506 (1970). (The *Miranda* issue was not presented to the Court in the Application for Writ of Certiorari.). See also United States v. Campione, 416 F.2d 486 (7th Cir. 1969).

A recurrence to the constitutional foundation is always an appropriate beginning point. The Fifth Amendment's mandate is that no person shall be "compelled in any criminal case to be a witness against himself, * * *."

Compulsion, a requisite to the invocation of the Amendment's protection against self-incrimination, was not attentuated in *Miranda*. The majority opinion in *Miranda* is complex and lengthy but the following pertinent extracts highlight the problem presented and explain the controlling principles. In the preface the court epitomized the decision's meaning thusly:

> "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

(384 U.S. at 444, 86 S.Ct. at 1612)

Part I began with the following paragraph:

> "The constitutional issue we decide in each of these cases is the admissibility· of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process. In all the cases, the questioning elicited oral admissions, and in three of them, signed statements as well which were admit-

ted at their trials. They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights."

(384 U.S. at 445, 86 S.Ct. at 1612)

The Court continued by pointing out that sophisticated psychological techniques had been developed by police to supplant the oft condemned use of physical force to extort confessions, the key to which called for isolating suspects from familiar surroundings and friends. It distilled the new techniques this way:

> "From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist."

(384 U.S. at 455, 86 S.Ct. at 1617)
and concluded thusly:

> "In each of the cases, the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures. The potentiality for compulsion is forcefully apparent, * * *. It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation."

(384 U.S. at 457, 86 S.Ct. at 1618)

Part II traced the history of the privilege, its embodiment in our Constitution and its subsequent court implementations down through Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), with this application of the latter's rationale:

> "The entire thrust of police interrogation there, as in all the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment. The ab-

dication of the constitutional privilege —the choice on his part to speak to the police—was not made knowingly or competently because of the failure to apprise him of his rights; the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, caused the defendant to speak."

(384 U.S. at 465, 86 S.Ct. at 1623)

Part III demonstrated how the rule announced was to be employed and detailed the justification for tendering an attorney's advice. It closed with this caveat:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. State of Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 1765. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.[46]

46. "The distinction and its significance has been aptly described in the opinion of a Scottish court:
'In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice may be, it must normally create a situation very unfavourable to the suspect.' Chalmers v. H. M. Advocate [1954] Sess.Cas. 66, 78 (J.C.)."

"In dealing with statements obtained through interrogation, we do

8. We held that routine tax investigations were not criminal in nature, and thus were beyond the protection of the Fifth Amendment without regard to the pres-

not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (384 U.S. at 477, 478, 86 S.Ct. at 1629–1630). Cf. United States v. Robertson, 425 F.2d 1386 (5th Cir. 1970).

In Mathis v. United States, supra, the taxpayer was convicted of tax fraud on the basis of evidence elicited by a regular revenue agent on a routine investigation made while the taxpayer was in prison for an unrelated crime. The Supreme Court reversed our affirmance of the conviction [8] because the prisoner had not been given the *Miranda* warnings. Although *Mathis* makes it clear that *Miranda* is potentially applicable to any tax investigation, it most definitely does not require *Miranda* warnings in all tax investigations. *Mathis* in no way diminishes the necessity for showing actual or inherent compulsion to self-incrimination. Mathis was not merely at the station house, he was imprisoned for a fixed term. He was deprived of his liberty in a most positive way. Thus when the court established that the type of inquiry there present was not determinative, the result was necessarily a finding of Fifth Amendment violation.

ence or absence of compulsion. Mathis v. United States, 376 F.2d 595 (5th Cir. 1967).

In our view, the Seventh Circuit's recent opinion in United States v. Dickerson, supra, which petitioner urges we now adopt, is an unwarranted extension of the *Miranda* decision. *Dickerson* held that *Miranda* warnings must be given a taxpayer at the inception of first contact with him following the transfer of a tax case to the Intelligence Division. The facts recited in that opinion show no element of custody or restraint—no deprivation of freedom—no compelling atmosphere—only a visit by a regular and a special agent of the Internal Revenue Service to defendant at his place of business. The opinion stated:

> "We understand the teaching of *Miranda* to be that one confronted with governmental authority in an adversary situation should be accorded the opportunity to make an intelligent decision as to the assertion or relinquishment of those constitutional rights designed to protect him under precisely such circumstances." 413 F.2d at 1114.

Thus, the court inferred compulsion from the fact that the investigators represented "governmental authority in an adversary situation." Such a rule is over broad and we expressly decline to follow it.

■ We cannot agree that every administrative official who confronts a citizen with a request for information that might disclose criminal conduct, thereby exerts a compulsion on the citizen that must be dispelled by the *Miranda* placebo. In today's vast and complex network of widespread daily administrative contacts between citizens and government officials, such a holding would open a veritable Pandora's box. When a census taker returns to recheck information he has received or a building inspector comes to investigate a report of noncompliance with provisions of the city housing code or a game warden who hears shooting out-of-season stops a man he finds in the woods or a bank examiner questions a teller whose figures are out of balance, would each then have to give the *Miranda* warnings? In each case a governmental official is confronting a citizen and criminal charges may result. There are a thousand and one administrative inquiries routinely made every day in every city which could evoke responses that might form a part of the basis in proof for a charge of perjury, falsification of records, failure to file a report or perform a legal duty or other criminal conduct. Most of these routine administrative confrontations would be rendered ineffective to the citizen and his government by imposing *Miranda* requirements. Indeed, if the warning became too commonplace, the very purpose of its requirement could be undermined. If "authority" were allowed to supplant custody —the deprivation of freedom—as the determinant of compulsion, even these routine field investigations which *Miranda* expressly exempted must fall. Under such a rule a policeman upon stopping a motorist could not ask to see his license without warning him and advising him in full.[9] It is not for this Court to so extend *Miranda,* and we are particularly unwilling to extend it to an adult experienced businessman, a law school graduate, who for over a year voluntarily furnished selected corporate and personal records to tax agents—not claimed to be overbearing but over kind.[10]

---

9. Cf. United States v. Marlow, 423 F.2d 1064 (5th Cir. 1970), where a routine request for a driver's license made without *Miranda* warnings produced a wrongfully acquired credit card that led to the driver's conviction for obstructing the mails.

10. There are other incongruities in *Dickerson*. It purports to apply *Mathis* but admittedly does not use *Mathis'* standard. In *Mathis* a routine examination by a regular revenue agent prior to any reference of the case to the Intelligence Division of the Revenue Service, was voided. *Dickerson* does not apply this rule, it admits incriminations by the taxpayer produced by the regular agent and only suppresses information obtained after the case had been transferred to the Intelligence Division. Since *Mathis* did not recognize any distinction between the regular and special agent, the compulsive effect of the agent's

The record shows that Prudden's interviews with all the agents were on generally amicable terms—what Prudden described as "a normal business arrangement." He limited the information he gave the agents, specifically refusing to give them requested information from years not under examination and the records of the Bahamian subsidiary. He testified that he was never threatened. He even testified that Lexow once told him that the Internal Revenue Service would not leave him alone unless he produced the Bahamian company records, yet he never produced them. There was simply no factual support for a contention that Prudden was put in such an emotional state as to impair his capacity for rational judgment.

Moreover, there is no evidence that the incriminating evidence was coerced as a matter of law; i. e., was the result of in-custody interrogation or anything approaching comparable pressures.[11] None of the evidence that Prudden seeks to suppress was obtained while he was under arrest or under any sort of actual or implied restraint. In fact, Prudden's fraud, deceit and trickery contentions strongly militate against any thought of pressure. The basic thrust of this other contention is that the agents were too nice to him. He was never deprived of his freedom in any significant way during the questioned interviews, all but one of which took place at his own office at his convenience during regular office hours.[12] The one interview which occurred in the Internal Revenue Service office is of no consequence. He came to the office voluntarily and was not restrained from leaving whenever he chose. The courts have uniformly held that such office interviews are neither custodial nor do they impose any significant restraints of freedom.[13]

---

official status is identical. Unless the regulations of the Internal Revenue Service are changed or United States v. Heffner, infra n. 12, is not followed, *Dickerson* will have no effect as precedent. Prior to its rendition, the Revenue Service adopted a regulation requiring special agents to give *Miranda* type warnings on their first contact with taxpayers. In recognition of the fact that *Dickerson* represented a departure from the present state of the law, the court determined that its holding would only apply to interrogations taking place after the date of the decision. Thus only *Dickerson* and the taxpayer in the companion case of *Habig* will be affected. If Prudden's case were now presented to that circuit he would get no benefit from that ruling since the investigations here involved took place in 1963 and 1964.

11. The Supreme Court in *Miranda*, defined custodial interrogation to mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way. The Court also emphasized that the "salient features" of the cases there decided showed "incommunicado interrogation of individuals in a police-dominated atmosphere." 348 U.S. at 445, 86 S.Ct. at 1612.

12. We recognize that custodial interrogation can occur beyond the confines of the station house. For example, in Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.

Ed.2d 311 (1969), the Court applied *Miranda* to incriminating evidence obtained by questioning the suspect in his own room in a boarding house. The suspect was alone and in the custody of four police officers who questioned him. Under those circumstances, Orozco was held to be significantly deprived of his freedom. But *Orozco* merely stands for the rule that "a compelling atmosphere" can exist outside of the station house, it does not hold that any inquiry by a government official carries such an element of intimidation as amounts to compulsion to self-incrimination. The majority opinion emphatically states: "We do not, as the dissent implies, expand or extend to the slightest extent our *Miranda* decision." See also United States v. Lackey, 413 F. 2d 655 (7th Cir. 1969), where a recorded courthouse basement interrogation of the taxpayer alone was held to be within *Miranda's* ambit. No comparable significant deprivation of freedom or compelling atmosphere ever existed in the case now before us.

13. *See e. g.*, Ping v. United States, 407 F. 2d 157 (8th Cir.), cert. den., 395 U.S. 926, 89 S.Ct. 1784, 23 L.Ed.2d 244 (1969); Spinney v. United States, 385 F.2d 908 (1st Cir.), cert. den., 390 U.S. 921, 88 S. Ct. 854, 19 L.Ed.2d 981 (1967); Schlinsky v. United States, 379 F.2d 735 (1st Cir.), cert. den., 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967).

In applying *Miranda's* rule, this Circuit has taken a case-by-case approach on the theory that "to foster proper development of controlling precedent * * * each case must be examined to determine whether there were present the compulsive factors with which *Miranda* was concerned." United States v. Montos, 421 F.2d 215, 223 (5th Cir. 1970). All of our case-by-case holdings have uniformly applied one concept—that *Miranda* warnings are not constitutionally required in tax investigation cases where the taxpayer is not deprived of his freedom and is not actually compelled or coerced to furnish statements or documents. Such holdings and our ruling here are also consistent with other circuits.[14] Our most recent decisions have maintained a similar consistency of approach. In Agoranos v. United States, 409 F.2d 833 (5th Cir.), cert. den., 396 U.S. 824, 90 S.Ct. 67, 24 L.Ed. 2d 75 (1969) the taxpayer sought reversal of a tax fraud conviction because he had not been given *Miranda* warnings. We refused to reverse because at the time the taxpayer was questioned by the special agent he "was not in custody and the *Miranda* doctrine applies only to in-custody interrogation."[15] Prudden seeks to distinguish *Agoranos* because the special agent did not know at the time of the questioning that the taxpayer was being investigated, but such an attempted distinction misses the true thrust of that holding—the taxpayer was not in custody or under compulsion when the interview took place. In United States v. Jernigan, 411 F.2d 471 (5th Cir.), cert. den., 396 U.S. 927, 90 S.Ct. 262, 24 L.Ed.2d 225 (1969) we again refused to require *Miranda* warnings. Prudden's attempt to distinguish this case because the agent was a regular and not a special agent not only conflicts with *Mathis* but is not apropos to the point he makes. Regular agents frequently obtain evidence which later forms one or more links in the chain which affixes criminality to the acts of a tax evader.

Marcus v. United States, 422 F.2d 752 (5th Cir. 1970) is our latest decision which discusses this question. Marcus was convicted for failing to file individual tax returns. One ground of his appeal was that he had not been given *Miranda* warnings nor expressly told of the criminal nature of the investigation by special agents of the Internal Revenue Service until after he had supplied rec-

14. An exhaustive collection of such authorities is set out in United States v. Squeri, 398 F.2d 785, 789–790 (2d Cir. 1968). See also United States v. White, 417 F.2d 89, 91 (2d Cir. 1969), cert. den. 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970) in which the Second Circuit explicitly refused to follow Dickerson, and the cases there cited, and Spahr v. United States, 409 F.2d 1303 (9th Cir.), cert. den. 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969). The only contrary authorities are the decisions of the Seventh Circuit in United States v. Dickerson and United States v. Habig, supra, and the District Court rulings noted in Dickerson, 413 F. 2d at 1114, n. 6. See also United States v. Casias, 306 F.Supp. 166 (D.Colo.1969). Though not as circumscribed as *Dickerson,* our holding here may have limited effect as precedent for the same reason mentioned in note 8, supra. Since May of 1967 the Internal Revenue Service has required Special Agents to give the taxpayer all essential *Miranda* warnings and advice at their initial conference. See I.R.S. News Release IR–949 (1969 CCH Fed. Tax Rptr. ¶6946). The Fourth Circuit has recently held that in tax investigations occurring after the inception of this policy the IRS is required to comply with its own rule on the basis of United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). United States v. Heffner, 420 F.2d 809 (4th Cir. 1969). Since this question is not presented by this appeal, we refrain from expressing any direct opinion on it. It is appropriate, however, that we now note that our holding here accords no retroactive significance to the promulgation of this administrative policy. That the Internal Revenue Service has voluntarily taken upon itself to now give a taxpayer *Miranda* type warnings and advice at the Special Agent's first meeting with him, does not give taxpayers questioned before the promulgation of this order additional constitutional rights.

15. 409 F.2d at 835.

ords and made damaging admissions.[16] Marcus contended, as Prudden now does, that *Miranda* applied to noncustodial tax fraud investigations. We rejected this contention with the statement: "In a criminal tax fraud case, this Court has recently held that the *Miranda* doctrine applies only to in-custody interrogation. Agoranos v. United States, 5 Cir., 1969, 409 F.2d 833. Since [the taxpayer] was at no time in custody during the Internal Revenue Service investigation, the contention is without merit." [17]

Two recent cases before this court, United States v. Roundtree, 420 F.2d 845 (5th Cir. 1969) and Stuart v. United States, 416 F.2d 459 (5th Cir. 1969), concerned a related but distinguishable question. Those taxpayers claimed that enforcement of an Internal Revenue Service administrative summons would compel them to incriminate themselves. In those cases we recognized that a routine tax investigation may be criminal in nature. In *Roundtree* we stated that if the taxpayer can show that the proceeding had become an inquiry with dominant criminal overtones, he would be entitled to raise Fifth Amendment objections. Compulsion was present in *Roundtree* and *Stuart* in the form of the subpoena and the single remaining element necessary to invoke the Fifth Amendment's protection was the claim of self-incrimination. Even if Prudden could show that the inquiry into the tax liability of the corporation, himself and his family was one with dominant criminal overtones, he would fail to bring himself within Miranda's ambit because he cannot show compulsion.

## II. THE CLAIM OF FRAUD, DECEIT AND TRICKERY

■ The trial judge suppressed all evidence obtained on or after the day when Lexow referred the case to the Intelligence Division because he found that the Internal Revenue Service agents engaged in a deliberate scheme to deceive Prudden in order to prevent his suspecting that the nature of the investigation had altered materially.[18] Here the ultimate fact determination was reached by a process of reasoning from undisputed evidentiary facts. After a careful review of the entire record, we conclude that ultimate fact finding—fraud, deceit and trickery by the agents—is a mistaken one.[19] We are left with the definite and firm conviction that this finding is in error.[20]

Because of the holding we make here it is unnecessary to discuss the breadth of the suppression order, reaching as it did not just personal records but corporate records in corporations with which Prudden was connected only as a director or an employee. No claim of privilege as to self-incrimination rela-

16. The facts in *Marcus*, which was decided after the instant appeal was argued, do differ from the case sub judice. In the words of that opinion:
"There is testimony in the record * * * that at the first interview the Internal Revenue agents informed Marcus that they were Special Agents attached to the Intelligence Division, which handles only criminal investigations, that he had a right to remain silent, and that anything he said could be used against him. Likewise, it is undisputed that the agents failed to inform Marcus that he had a right to an attorney, as they were required to do if Marcus was entitled to a *Miranda* warning." 422 F.2d at 756. These factual differences do not serve to distinguish *Marcus*. The rights protected by *Miranda* are constitutional in nature and if *Miranda* warnings and advices are required at all, they are all required for unconstitutionality knows no gradations.

17. 422 F.2d at 756.

18. 305 F.Supp. at 111.

19. Galena Oaks Corporation v. Scofield, 218 F.2d 217 (5th Cir. 1954); Mayo v. Pioneer Bank & Trust Co., 297 F.2d 392 (5th Cir. 1961).

20. United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948); United States v. Singer Mfg. Co., 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963); Minneapolis-Moline, Inc. v. Bryan, 415 F.2d 841 (5th Cir. 1969).

tive to this type of third party records has previously been recognized. *See, e. g.*, Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Fineberg v. United States, 393 F.2d 417 (9th Cir. 1968); Hensley v. United States, 406 F.2d 481 (10th Cir. 1968).

■ If the evidence obtained subsequent to Special Agent Cohen's entry into the investigation were the result of an unreasonable search in violation of the Fourth Amendment, then it would have to be suppressed. Prudden also asserts violation of Fifth and Sixth Amendment rights. Since all claimed violations depend upon a showing of the existence of fraud, deceit or trickery, it is not necessary to discuss each constitutional claim separately. Prudden postulates that the search was unreasonable because his consent to examine the records was obtained by fraud, deceit and trickery. While we recognize that fraud, deceit or trickery in obtaining access to incriminating evidence can make an otherwise lawful search unreasonable,[21] Prudden, as the moving party in the motion to suppress, did not sustain the burden that was his of demonstrating that fraud, deceit or trickery were present.[22]

The essence of Prudden's contention and the finding of the trial court is that the circumstances surrounding the transformation of the investigation into one with increased possibilities of resultant criminal charges without Prudden's knowledge, required suppression of the evidence.[23] Just how Prudden was defrauded, deceived or tricked is what we

fail to perceive. Certainly, if the agents had given Prudden the full panoply of *Miranda* warnings, and advice, he could not make such a claim. *Miranda* warnings, however, were not required. So what were the agents required to do or leave undone or say or let go unsaid that discloses the fraud, deceit and trickery? They told him they wanted to audit and examine records in his possession relating to tax returns. They pursued this announced intention in what Prudden describes as a businesslike way at intervals over many months, despite his occasional expressions of discontent. We are unable to say that they had a duty to do more or less under the circumstances disclosed by this record.

■ Prudden points to the failure of Special Agent Cohen to tell him that his function was to investigate for criminal fraud. All Cohen was required to do by the then existing Internal Revenue Service requirements was to tell Prudden that he was a Special Agent and show Prudden his credentials. This he did. He in no way concealed his true identity. He could not have affirmatively mislead Prudden as to the function of the Intelligence Division or as to the duties of a special agent, since neither of these subjects were ever discussed. Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading.[24] None of these factors were present here.

In Spahr v. United States, supra note 21, one ground of taxpayer's appeal of

---

21. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); Spahr v. United States, 409 F.2d 1303 (9th Cir. 1969), cert. den., 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969); United States v. Sclafani, 265 F.2d 408 (2d Cir.), cert. den., 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed. 2d 1534 (1959).
   We explicitly reject the government's contention that the agents were free to use fraud, deceit or trickery. In cases where the IRS agents are obtaining consent to examine documents, they cannot gain such consent by affirmatively misrepresenting the nature of the search.

22. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed.2d 307 (1939); Der Garabedian v. United States, 372 F. 2d 697 (5th Cir. 1967).

23. 305 F.Supp. at 111.

24. *See* United States v. Sclafani, 265 F.2d 408 (2d Cir.), cert. den., 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959); *c. f.*, Avery v. Cleary, 132 U.S. 604, 10 S.Ct. 220, 33 L.Ed. 469 (1890); Atilus v. United States, 406 F.2d 694, 698 (5th Cir. 1969); American Nat'l Ins. Co., etc. v. Murray, 383 F.2d 81 (5th Cir. 1967).

his conviction for corporate tax evasion was that incriminating evidence was procured through guile and fraud. Allegedly the revenue agents fraudulently concealed the true purpose of their investigation. As in the instant case, two agents merely identified themselves as a special agent and a revenue agent, respectively, without giving any additional warnings. The Ninth Circuit found no deception. Quoting the Second Circuit's opinion in United States v. Sclafani, supra note 21, they said: [25]

"A 'routine' tax investigation openly commenced as such is devoid of stealth or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that the government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasion, mistake and willful omission."

In Sclafani, as in the instant case, the taxpayer objected that records obtained from him after the "routine audit" commenced by a revenue agent was turned over to a special agent should have been suppressed because they were obtained through stealth and deceit. The court found no fraud or deceit and stated: [26]

"The Fourth Amendment does not require more than this, that when his consent is sought the taxpayer be apprised of the government's concern with the accuracy of his reports, and therefore of such hazards as may be incident to a voluntary disclosure. We hold that Sclafani was so apprised by the warning inherent in the request when Agent Sonkin identified himself and disclosed his purpose to audit certain returns of the corporation."

We conclude that the mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery. Therefore, the record here must disclose some affirmative misrepresentation to establish the existence of fraud, and this showing must be clear and convincing. [27]

Prudden points to several incidents to establish the existence of affirmative misrepresentations by the Internal Revenue Service agents. He does not in any of these, however, establish fraud by clear and convincing proof, rather the evidence tends to show that fraud was not present.

*Audit and Examination.* Prudden seeks to distinguish *Spahr* and *Sclafani* because in those cases no affirmative acts of misrepresentation were shown. On the other hand, Prudden claims that Cohen's statement at the hearing that "we informed Mr. Prudden that we had come for an audit and examination of his returns—his son's returns, and the returns of the Florida Corporation of America and its eight subsidiaries" was affirmative misrepresentation in the case at bar. Telling Prudden that an audit and examination were to take place is not deceptive. That is exactly what the agents did. They audited and examined his books. That in so doing they uncovered incriminating evidence does not change the character of the investigation they undertook. Audit and examination is but one means of gathering evidence in a tax fraud case. Since the agents did not have to warn him directly that they were undertaking a criminal investigation, then telling him the means by which they were to gather evidence in no way is misleading.

---

25. 409 F.2d at 1306, *quoting*, 265 F.2d at 414–415.

26. 265 F.2d at 415. *See* United States v. Squeri, 398 F.2d 785, 788 (2d Cir. 1968): "[T]he information that a taxpayer's returns are under audit gives notice of the possibility of criminal prosecution regard-

less of whether the agents contemplate civil or criminal action when they speak to him."

27. Jett v. Zink, 362 F.2d 723, 729 (5th Cir. 1966), cert. den., Chamberlain v. Zink, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1967).

*Letters from Lexow to Prudden.* Prudden contends that the two letters from Lexow fraudulently misrepresented the nature of the inquiry. The July 9th letter, which was written before the Intelligence Division came into the case but while Lexow was preparing to refer it to them, asked Prudden to send records of one of FCA's subsidiaries to him in order to facilitate his examination and to save Prudden time.[28] There are no misrepresentations of fact in the letter. Even if the letter had been misleading, Prudden complains of no evidence obtained as a result of it. In fact, the record does not show that he ever complied with the letter's request. Furthermore, the trial court's suppression order only applied to evidence obtained on or after August 14, a full month after the writing of the letter.

The second letter was written on August 28,[29] two weeks after the referral of the case to the Intelligence Division without advising him of any change in the nature of the investigation. There is no evidence of guile by Lexow. He testified that he was only conscientiously trying to leave a complete record of all the facts he had previously accumulated for his successor. The documents he requested were those which Prudden had already authorized him to copy, but he had inadvertently left them in Prudden's office. Thus, nothing new was added to the government's case. Furthermore, the evidence received pursuant to this letter was exempted from the suppression order by the trial court, to which Prudden did not object. Secondly, Prudden contends that the letter was deceptive since Lexow's reference to the transfer of the case to Revenue Agent Stanley was calculated to raise no suspicion and specific mention that Special Agent Cohen of the Intelligence Division would henceforth be in charge of the investigation was omitted. Lexow testified that his omission of the Special Agent's assignment to the case was not made because he was afraid of the flow of information would be cut off. The only possible harm in this letter would be that Prudden would think that the entry into the case of a different agent was of no significance. Whatever momentary misapprehension in this direction that was left in Prudden's mind by the letter should have been quickly dispelled by the actual appearance not only of Revenue Agent Stanley but also Special Agent Cohen. In place of one neophyte, two experienced agents appeared and persisted in an examination and audit for fifteen months. At any rate, this contention falls far short of persuading us that the letter was fraudulent.

*Friendliness of the Agents.* Prudden argues that the nature of the investigation was concealed because of the friendliness and cordiality of the relationship between himself and the agents. Most of the evidence he cites as proof of deceit through cordiality is with regard to Lexow. Here again we are reminded that none of the information gathered by Lexow is subject to suppression. Even with regard to the more businesslike attitudes adopted by Cohen and Stanley, we perceive no possible subterfuge. We can see no reason why civil servants should be required in their daily dealings to assume an uncivil character just because they are in a position to discover criminality on the part of a citizen. That would be a poor form of warning at best. If direct warnings are unnecessary, then requiring circuitous warnings by the manner of action of the agents is irrational. Furthermore, the tone of every interpersonal relationship is subject to the control of all the parties. Prudden's own conduct was a necessary ingredient of the amicable relationship of which he now complains. It may well be that kindness on a taxpayer's part could be calculated to dispel an agent's suspicions or to help to persuade him to see the results of his investigation in the most favorable light. By this we only mean to observe that "it takes two to tango".

*Promises and Advice.* Prudden further argues that promised advice from

28. This letter is set out at note 3 *supra.*

29. This letter is set out at note 4 *supra.*

the agents, another manifestation of their "deceptive" cordiality, was fraudulent. He first claims that Lexow said that he would advise him on how to handle one feature of a particular stock sale involving a 52,800 dollar escrow account. Lexow promised Prudden an answer when he knew all the facts. But Lexow left the investigation without giving Prudden any answer. So Lexow's promise was not deceitful. Prudden also pressed Cohen and Stanley for advice in regard to the same transaction but admits that he got no "recognizable answer." The long and short of this is that none of the agents ever gave him any advice on the escrow transaction. How could this deceive him? Prudden also claims that the failure of the agents to advise him that he should file an amended return in 1963 was misleading. He asked Cohen if he should file an amended return and was told that the agents would consider only his original return in preparing their report. This is no more than a factual statement. It was not shown to be false or deceitful.

*Cumulative Misrepresentations.* The explication of a case in factual and legal segments can distort the overall picture of what really happened. Therefore, we have carefully reviewed the record as a whole but still cannot find that Prudden sustained his burden of proving fraud, deceit and trickery. Goodman v. United States, 285 F.Supp. 245 (C.D.Cal.1968), which was relied on by the District Court is distinguishable. Most noticeably, in that case the taxpayer had only a grammar school education and was affirmatively led to believe that the information which he was giving the revenue agents was part of the investigation of another taxpayer. That is not near this case on either count.

Any reasonable person is bound to be aware that the filing of an incorrect tax return may result in a charge of wrongdoing. If common sense and knowledge are not enough, then the warning at the bottom of every tax form which the taxpayer must sign before filing, should

suffice.[30] The appearance of the revenue agent at the door, in itself, ought in no way to dispel this knowledge of a potential criminal charge. Rather, when the agent says he is there to examine the taxpayer's books, the taxpayer's concern should intensify. We find it entirely implausible for Prudden, a well-educated businessman with a law degree and experience in the tax field, to claim that he did not know that the investigation could lead to criminal charges and that after fifteen months of investigation by numerous special agents of his affairs in New York and Florida, he was surprised or shocked to find himself in a criminal case. When the record is taken most favorably to Prudden's position it falls markedly short of demonstrating by clear and convincing evidence that he was the victim of fraud, deceit or trickery. The suppression order is reversed and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

30. The warning states: "Under penalties of perjury, I declare that I have examined this return, including accompanying sched-

ules and statements, and to the best of my knowledge and belief it is true, correct, and complete."