**UNITED STATES of America, Plaintiff,**

**v.**

**Edward S. DUNN, Defendant.**

No. 76–30–CR5.

United States District Court,
D. Kansas.

Oct. 12, 1976.

E. Edward Johnson, U. S. Atty., Topeka, Kan., for plaintiff.

Charles D. McAtee, Topeka, Kan., Thomas E. King, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

Defendant, Edward S. Dunn, has filed a motion to suppress all oral and documentary evidence obtained from him by agents of the Internal Revenue Service (hereinafter IRS) between April 24 and July 3, 1973, and any evidence derived therefrom. He asserts that the evidence was seized in violation of the fourth and fifth amendments to the Constitution by Revenue Agent Allen K. Olmstead who, by deceit, trickery and fraud, affirmatively misrepresented the nature of the inquiry into defendant's tax and financial records. Defendant is charged with the willful failure to report portions of income tax due for the years 1969–72, in violation of 26 U.S.C. § 7201. After conducting an evidentiary hearing, the parties have submitted memoranda supporting their respective positions. The Court, after hearing the evidence, considering the statements by counsel and the memoranda filed in support thereof, makes the following findings and order.

Defendant's motion to suppress certain oral and documentary evidence requires the Court to consider a taxpayer's constitutional rights when subjected to a civil tax audit which precedes and produces evidence utilized in a subsequent criminal tax investigation. On July 3, 1973, defendant was given the *Miranda*-type warnings required after a taxpayer's income tax audit is referred to the IRS Intelligence Division. See *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Defendant's attorneys do not contend nor would the evidence support a finding that the revenue agent obtained the evidence in question by overbearing defendant's will. *Beckwith v. United States, supra,* at 348, 96 S.Ct. at 1615, 48 L.Ed.2d at 7. However, if Revenue Agent Olmstead obtained evidence to be used in this criminal prosecution

against the defendant by fraud, deceit or trickery, such would constitute an unlawful seizure of incriminating evidence from defendant in violation of the fourth and fifth amendments to the Constitution. The standard for considering such a claim is precisely stated in *United States v. Prudden*, 424 F.2d 1021, 1033 (5th Cir. 1970).

> The mere failure of a revenue agent . . . to warn a taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit or trickery. Therefore, the record here must disclose some affirmative misrepresentation to establish the existence of fraud, and this showing must be clear and convincing.

Thus, as stated in *United States v. Lehman*, 468 F.2d 93 (7th Cir. 1972),

> [a] revenue agent must not affirmatively mislead a taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal consequences.

For similar holdings, see *United States v. Marra*, 481 F.2d 1196 (6th Cir. 1973); *United States v. Robson*, 477 F.2d 13 (9th Cir. 1973); *United States v. Stribling*, 437 F.2d 765 (6th Cir. 1971) (following *Prudden, supra*); *United States v. Sclafani*, 265 F.2d 408 (2d Cir. 1959); *United States v. Trnka*, 385 F.Supp. 628 (D.N.D.1974); *United States v. Wohler*, 382 F.Supp. 229 (D.Utah 1973); and see *Cohen v. United States*, 405 F.2d 34 (8th Cir. 1968). Silence or evasiveness can be equated with fraud only where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading. *United States v. Prudden, supra* at 1032. However, a taxpayer's awareness that his returns are under audit may provide sufficient notice of the potential of criminal prosecution. *United States v. Squeri*, 398 F.2d 785 (2d Cir. 1968). Such a finding, however, appears to depend somewhat upon the business or legal experience of the taxpayer. Circuit courts of appeal impose an extremely high burden of proof upon the taxpayer who

makes such allegations. This stems from a willingness to allow the revenue agent substantial leeway in routine civil tax audits. The revenue agent may thus be encouraged to avoid making unwarranted referrals of civil tax audits to the IRS Intelligence Division for possible criminal tax investigations and to avoid causing the stigma which relates thereto.

A routine tax audit is generally initiated with a civil tax audit of the taxpayer's records for specified years. Such audits are conducted by revenue agents. Revenue agents are guided in such proceedings by § 10.09 of the Internal Revenue Service Audit Technique Handbook. It provides in pertinent part:

> The Internal Revenue Manual requires that a revenue agent immediately suspend his investigation, without disclosing to the taxpayer or his representative the reason for his action, when he discovers what he believes to be an indication of fraud. He should report his findings in writing to the Chief, Audit Division, through his group supervisor. . . . The purpose of the referral is to enable the Intelligence Division to evaluate the criminal potential of the case and decide whether or not a joint investigation should be undertaken. It is important, therefore, that the agent's referral report contain detailed information to enable the Chief, Intelligence Division, to make a proper evaluation.

> When an agent has been alerted to the possibility of fraud, he must know at what point he should suspend his examination and prepare his referral report. If he stops too soon he may not have developed all the information necessary for the Chief, Intelligence Division, to base his decision. He may not be able to demonstrate that there is an actual understatement resulting from his findings if he has not gathered sufficient facts or sought explanations which would account for the discrepancy. Or he may not have found sufficient evidence relating to intent. If he continues his examination too far he may find it necessary to repeat some of the work done by the revenue agent in

order to document the evidence required in a criminal case. He may give the taxpayer a basis for claiming that the criminal case was substantially built by the revenue agent under the guise of conducting an audit for civil tax purposes. Due to inexperience he may take actions which can jeopardize the criminal case.

> Certain guidelines can be laid down to aid the agent in deciding how far to proceed in his examination where the possibility of fraud exists. The first of these would be to define what is meant by an 'indication of fraud.' A revenue agent can be satisfied that he has discovered an indication of fraud when he has determined that there has been a substantial understatement of income and that there is an indication that the understatement was deliberate.

These guidelines create the possibility that the revenue agent will have obtained evidence necessary for a conviction before preparing the referral report, however, this would be constitutionally permissible provided the evidence was not obtained through an affirmative misrepresentation as to the present or potential consequences of the audit. The guideline is quoted at length to illustrate the tightrope the revenue agent is forced to walk when conducting a civil tax audit. In construing the phrase "indication of fraud," the Tenth Circuit Court of Appeals in *United States v. Lockyer*, 448 F.2d 417, 421–22 (10th Cir. 1971), stated,

> In our view broader meaning was intended. The detailed instructions given require the agent to continue his investigation so as to verify a substantial understatement of income and so as to obtain explanations from the taxpayer in order to discover evidence whether the understatement was deliberate. Therefore, a fair reading of the entire provision convinces us that the civil investigation was intended, consistent with the directive, to continue for sufficient time and· in enough depth so as to provide the Chief, Intelligence Division, with enough information to reach his decision.

While in *Lockyer*, the Tenth Circuit Court of Appeals was not addressing an alleged abuse of a civil tax audit, its reading of the directive comports with those decisions which deal with alleged affirmative misrepresentations regarding the nature or potential consequences of a routine civil tax audit. While a violation of the guideline would not necessarily constitute a violation of a taxpayer's constitutional rights, *United States v. Lockyer, supra*, balancing a taxpayer's rights under the fourth and fifth amendments with the guidelines in a particular set of facts requires careful consideration by the Court even though the taxpayer bears the heavy burden of proving an affirmative, material misrepresentation was made regarding the nature or status of the inquiry. To further obscure the procedure, the revenue agent must consult with his group supervisor before a case may be referred to the Intelligence Division. Then, based upon the referral report, the IRS Intelligence Division determines whether an investigation for tax fraud should be conducted by its special agents. In *United States v. Michals*, 469 F.2d 215 (10th Cir. 1972), the Tenth Circuit Court of Appeals recognized that a tax audit should be referred to the Intelligence Division only after the taxpayer is allowed an opportunity to explain any possible tax discrepancies. In this context, and under these particular facts, the government agents did not improperly delay the referral of the tax audit to the Intelligence Division to obtain further evidence from Dunn without giving the proper cautionary warnings nor did they affirmatively mislead or misrepresent the nature or potential consequences of the tax audit. Thus, from the evidence, defendant has failed to sustain his burden of proving such allegations by clear and convincing evidence and the motion to suppress will be denied. The Court bases its decision upon the following facts:

Defendant is an attorney who was admitted to the bar in 1960. He has a private law practice in Holton, Kansas, where he had served as the county attorney. His practice includes reviewing and signing income tax returns for his clients although the returns are usually prepared by his secretary. Before his own tax audit, defendant had represented a client who was subject to an income tax investigation.

Defendant asserts that on April 24, 1973, he wrote the IRS Center for the Southwest Region requesting an audit of his tax returns because he had discovered he did not have all his deposit slips when he prepared his income tax returns and further requesting assistance in filing amended returns. Revenue Agent Allen K. Olmstead was assigned Dunn's case on May 7, 1973. The file assigned to Olmstead did not contain the letter from Dunn. While the file merely called for a routine civil tax audit, Olmstead determined early in the audit that he would need all Dunn's financial records to fully clarify Dunn's tax status. Dunn and Olmstead had their first meeting on May 30, 1973. During a day-long session, Olmstead attempted to examine all the records Dunn had produced. By the end of the meeting, Olmstead had concluded that Dunn's records reflected an overstatement of expenses and an understatement of income. Olmstead, however, had not determined whether there were satisfactory explanations for such apparent discrepancies or whether they were deliberate. The following day, Olmstead called Dunn to indicate that certain apparent deposits were not supported by documentation. The taxpayer testified he felt the telephone conversation was "accusatory" in nature. Consequently, at their next meeting on June 5, 1973, Dunn testified that he inquired of Olmstead as to the specific purpose of the audit and that Olmstead replied that it was a simple routine tax audit to determine any civil tax liabilities owed, if any. Olmstead testified that he did not recall such a conversation. Defendant asserts that Olmstead's alleged statement constituted an affirmative misrepresentation as to the nature of the tax audit requiring the suppression of the evidence obtained from him on or after June 5, 1973.

Even assuming the conversation occurred, the Court finds it to be insufficient basis for suppressing the evidence subsequently

obtained. First, Olmstead was under a duty to verify any overstatements or understatements and also to determine whether satisfactory explanations existed therefore. *United States v. Michals*, 469 F.2d 215 (10th Cir. 1972). Second, Olmstead testified that while he found discrepancies in defendant's tax returns during or soon after the initial meeting, he found no firm indication of fraud or deliberateness until the meeting on June 26, 1973. The referral report was prepared immediately thereafter. Thus, on June 5, 1973, Olmstead was only seeking to determine Dunn's *civil* tax liabilities, if any. As noted in *United States v. Sclafani*, 265 F.2d 408 (2d Cir. 1959) [quoting *United States v. Wolrich*, 119 F.Supp. 538, 540 (S.D. N.Y.1954)];

> "Surely defendant was aware that, if a 'routine audit' revealed evidence of criminal liability, the agent would not ignore it merely because he was primarily concerned with civil liability. . . . A statement that the purpose of an investigation is a 'routine audit' is not the equivalent of a promise that only civil liability will be considered regardless of what the examination reveals. Nor would any accountant or business man so understand it."

The Court concurs and feels that no attorney would so understand it. Third, there was some confusion in defendant's records as to the source of the funds in several accounts. After the meeting of June 5, 1973, Olmstead consulted with his group supervisor. They concluded that it would be necessary to analyze Dunn's savings accounts to determine the source of each deposit and whether or not they constituted income. Olmstead telephonically advised Dunn of this on June 8, 1973. This reflects a need for further information or explanations before Olmstead could properly analyze Dunn's civil tax status, not an effort to surreptitiously obtain evidence from Dunn for a criminal prosecution. Finally, in light of Dunn's profession and prior involvement in a tax audit of one of his clients, his question to Olmstead, if asked, implies an awareness of the potential criminal tax investigation and a desire to have Olmstead

bind the IRS from going beyond a routine civil tax audit. Based upon these considerations, the Court finds that during the meeting of June 5, 1973, Dunn did not produce either oral or written evidence based upon an affirmative material misrepresentation by Olmstead.

Olmstead and Dunn met next on June 12, 1973. Dunn asserts that he asked Olmstead whether his audit was considered a fraud case and that Olmstead replied "it was not a fraud case and that at that particular point in the examination it was not possible to tell what the outcome would be." (Defendant's memoranda at 14). Again Olmstead testified he did not recall such a statement. Even assuming the conversation occurred, it does not rise to the level of an affirmative material misrepresentation. The statement was an accurate reflection of Olmstead's authority as restricted to civil tax audits. Only the Intelligence Division could determine whether a case should be investigated for evidence of tax fraud. Further, Olmstead's alleged response supports a finding that Olmstead needed to pursue the audit further to properly determine Dunn's civil tax liability.

On June 15, 1973, Olmstead and Dunn met again. Dunn indicated he wanted to file an amended tax return for the years 1971 and 1972. Olmstead, after consulting with his group supervisor, advised Dunn that this would be futile since his records in the Austin IRS Service Center were tagged as under audit and the amended return would be automatically forwarded to Olmstead as the revenue agent conducting the audit. Thus, when Olmstead later failed to respond to Dunn's request for assistance in preparing the amended returns, he was justified in his silence in light of his previous explanation.

Olmstead and Dunn met again on June 21 and June 26, 1973. During the later meeting, Dunn produced revised computations of his taxable income for the years 1971 and 1972. Dunn stated he had determined that his 1972 income was understated by $30,-000.00. It was after the June 26, 1973, meeting that Olmstead's Group Supervisor,

Billy Loeffler, prepared the Referral Report for Potential Fraud Cases. Prior to June 27, 1973, Olmstead had had no contact with the IRS Intelligence Division regarding Dunn's file. Thereafter, based upon the referral report, the Intelligence Division determined that a tax fraud investigation should be conducted regarding Dunn's tax returns. When Special Agent Merritt and Olmstead met with Dunn on July 3, 1973, he was advised of his rights as required by IRS regulations.

Under the standards stated in *United States v. Prudden*, 424 F.2d 1021 (5th Cir. 1970) and similar cases, and after examining the totality of the circumstances which preceded the July 3, 1973, meeting, the Court finds that the defendant has failed to establish by clear and convincing evidence that oral or written evidence was obtained from him by affirmative misrepresentations rising to the level of fraud, deceit or trickery. Thus, defendant's rights guaranteed by the fourth and fifth amendments to the Constitution were not violated during the civil tax audit which preceded the criminal tax audit investigation which now serves as a basis for the above-entitled action. While the Court does not fully approve of the lack of clarity regarding the import of the civil tax audit of Dunn's financial and tax records, defendant has failed to establish an abuse or guise based upon an affirmative material misrepresentation by clear and convincing evidence.

IT IS THEREFORE ORDERED that defendant's motion to suppress be, and is hereby, DENIED. Further the parties and their attorneys should stand ready for trial after November 1, 1976.

IT IS SO ORDERED.