UNITED STATES of America,
Appellant,

v.

Norman F. IRVINE, Defendant,
Appellee.

No. 82–1386.

United States Court of Appeals,
First Circuit.

Argued Dec. 9, 1982.

Decided Jan. 28, 1983.

Bruce E. Kenna, Asst. U.S. Atty., with whom W. Stephen Thayer, III, U.S. Atty., Concord, N.H., on brief, for appellant.

J. Normand Jacques, Concord, N.H., for defendant, appellee.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The government has charged Norman Irvine with willfully failing to file federal income tax returns from 1975 to 1979, in violation of 26 U.S.C. § 7203. The district court found that, at a February 1981 meeting, an IRS officer failed to state that he was conducting a criminal investigation when warning Irvine and his wife of their constitutional rights. This omission violated an IRS regulation on the subject, IRM 9384.2(2)(a)(b), NAR Pub. No. 120 (Rev. 8–77), and, in the court's view, it led the Irvines to believe that the investigation was civil rather than criminal. For these reasons, the court ordered suppression of the statements and records that the IRS agent thereby obtained. The government appeals from the suppression order. *See* 18 U.S.C. § 3731. We agree with the government that, at least since the decision in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), suppression is not appropriate in the circumstances present here. We therefore reverse the order of the district court.

As we have previously noted, IRS investigations differ from those of the police in that "they are usually, if not wholly civil, a hybrid civil-criminal investigation." *United States v. Leahey,* 434 F.2d 7, 8 (1st Cir. 1970). Here, the parties agree that the first IRS agents to call upon the Irvines, after the IRS learned that the Irvines might have failed to file, were agents involved solely in civil investigations. The relevant meeting, however, was a visit on February 2, 1981, by Special Agent Edward Blair, who worked in the IRS Criminal Investigation Division.

Blair and the Irvines—the only witnesses at the suppression hearing—for the most part agreed about what had happened. Blair and another agent came to the door of the Irvines' home early in the morning. Mrs. Irvine answered and summoned Mr. Irvine, and the agents and the Irvines met in the kitchen. Blair testified that he showed the Irvines his credential. The outside of the credential has a gold badge on it, which states "Criminal Investigation" on top; the inside has Blair's picture and the words "Special Agent Criminal Investigation Division."

Blair also testified as follows:

I stated the purpose of our being there was to ask him questions relative to his income tax liability, and ... before he gave answers that I was required to give him his rights, under the Fifth Amendment of the Constitution ... and we are required to read them a printed card that we carry with us....

I read the complete card to him.... Verbatim ....

It says, "As a Special Agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue law and related offenses.... In connection with my investigation of your tax liability, or any other matters, I would like to ask you some questions. [H]owever, first, I advise you that under the Fifth Amendment of the Constitution of the United States, I cannot compel you to answer any questions, or to submit any information, if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceedings which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding." ...

My next step is to say, "Do you understand your rights; do you understand what I said?" And he said, "Yes, I do."
. . .

As part of our investigatory procedure, we asked the taxpayer if he would turn over records to us. Mr. Irvine stated that he would . . . .

At the conclusion of our interview on that particular day, he asked the steps that would be taken after[ward] . . . .

I told him that it was my responsibility to complete the investigation; to prepare a report; make a recommendation. The report is then reviewed by my superior, by our counsel, and then, if recommended prosecution, reviewed by the Department of Justice and, ultimately, referred to the United States Attorney.

Both Irvines *confirmed* most of Blair's testimony. In particular, Mr. Irvine testified that Blair showed him his identification, that he read him his rights from the card, that he confirmed that Irvine understood his rights, and that, when leaving, he told him specifically about the possibility of prosecution.

Irvine stated, however, that he had not really looked at Blair's identification, that Blair had not mentioned the word "criminal" when he read from the card, and that Irvine had the impression that Blair had a right to take the records. Overall, Irvine said, he had not been given the impression that Blair was conducting a *criminal* investigation; and, given the prior interviews by civil investigators, he simply did not realize the seriousness (*i.e.*, the criminal implications) of the situation. Mrs. Irvine agreed with Mr. Irvine, but she did not deny that Blair read the word "criminal" from the card; she said he read the card, but she could not remember hearing the word "criminal" read.

The district court accepted Blair's account of the warnings given as accurate, with one exception. The court found that the government had not proved that Blair read the word "criminal" from the card. For this reason, the court found that Blair had violated the IRS regulation, which re-

quires that the card be read verbatim. The court therefore ordered that the statements and records be suppressed.

In the absence of the IRS regulation, Mr. Irvine would have no constitutional claim. Given the fact that he was not in custody and the undisputed testimony that he was told of his right to remain silent and to an attorney, he has no Fifth or Sixth Amendment claim. Nor do the agent's actions constitute an "unreasonable" search or seizure in violation of the Fourth Amendment. While warrantless searches and seizures are generally unreasonable per se, searches and seizures made with consent are an exception to the warrant requirement. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Blair told the Irvines that he could not compel them to submit any information; he told them that any information that they did submit might be used against them; and they told him that they understood what he said. All parties agree that the Irvines were being "cooperative" at the interview. Thus, even if the exact words that Blair used were "I'm taking these records," as Irvine testified, instead of a request, as Blair testified, the understood warnings, the Irvines' cooperation, and the lack of any hint of objection show that the "seizure" was consented to and hence reasonable.

The mere failure to mention that Irvine was the subject of a criminal investigation does not alter the Fourth Amendment analysis. Several courts have suggested that evidence be suppressed as a remedy for misrepresentations by IRS agents about the purpose of their investigations. *See, e.g., United States v. Tweel,* 550 F.2d 297 (5th Cir.1977); *Spahr v. United States,* 409 F.2d 1303 (9th Cir.1969); *United States v. Sclafani,* 265 F.2d 408 (2d Cir.), *cert. denied,* 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959). But, even if these suggestions do not run afoul of, say, *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (allowing informant to make misrepresentations), and *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) (allowing undercover

agent to make misrepresentations), the remedy is suggested only for fairly serious *affirmative* misrepresentations. No case holds that an IRS agent breaches a constitutional duty when he obtains information merely by failing to state specifically that he is conducting a criminal investigation. And, we see no basis for such a holding in circumstances such as those present here, where any reasonable person would have known from what the agent explicitly did say that a criminal prosecution could well be in the offing. Indeed, several cases have expressly denied suppression when IRS agents made no affirmative misrepresentations but simply failed to disclose information. *See, e.g., United States v. Robson,* 477 F.2d 13 (9th Cir.1973); *United States v. Lehman,* 468 F.2d 93 (7th Cir.), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972); *United States v. Prudden,* 424 F.2d 1021 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

Our conclusion on this point is buttressed by the Supreme Court's decision in *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In *Beckwith,* the court held that IRS criminal investigators need not give *Miranda* warnings prior to noncustodial interviews. Yet, to omit *Miranda* warnings altogether is more likely to mislead a potential defendant as a practical matter, than simply to omit the word "criminal" when an investigator gives those warnings. Given *Beckwith,* there is no reason to believe that the Constitution forbids the less significant omissions at issue here.

■ The only issue, then, is whether suppression is required because Blair violated an IRS regulation by failing to state the word "criminal." We believe that it is not. In the past, this court has suppressed evidence obtained by the IRS in violation of agency "warnings" requirements. *See United States v. Jobin,* 535 F.2d 154 (1st Cir.1976); *United States v. Morse,* 491 F.2d 149 (1st Cir.1974); *United States v. Bembridge,* 458 F.2d 1262 (1972); *United States v. Leahey, supra.* However, in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), the Supreme Court held that the simple fact that evidence is obtained in violation of an agency regulation does not warrant suppression where the regulation is not required by the Constitution or by statute. Here, no statute requires the regulation at issue, and *Beckwith* makes clear that the regulation is not constitutionally required.

While some of the Court's language in *Caceres* indicates that there might be individual "regulation violation" cases in which suppression would nonetheless be appropriate, it is clear that any such exceptions would be unusual. We find no basis for creating any such exception here. In this case, there is no indication that the agent's behavior could significantly have prejudiced the Irvines' exercise of any constitutional right. Indeed, it is even questionable whether the "spirit" of the regulation was violated.

In light of *Caceres,* the approach taken by this court in *Leahey* and its successors is no longer good law. In developing rules for determining when violation of an agency regulation warrants suppression, *Leahey* employed a "regulation-wide" approach rather than an "individualized" approach drawing upon the facts of the particular case at issue. Thus, even if *Caceres* allows exceptions, as we read that case, it forecloses an approach that proceeds regulation by regulation, rather than case by case. *See* 440 U.S. at 752–53, 99 S.Ct. at 1471–72. We therefore no longer treat *Leahey* and its progeny as binding precedent.

The order of the district court is

*Reversed.*