**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jesse C. POWELL,
Defendant–Appellant.**

**No. 87–2447.**

United States Court of Appeals,
Fifth Circuit.

Jan. 6, 1988.

Charles J. Escher, Edward D. Urquhart, Houston, Tex., for defendant-appellant.

Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., Gale Brodfuehrer, Atty., Tax Div., Appellate Dept. of Justice, Michael L. Paup, Chief, Appellate Section, Michael C. Durney, Acting Asst. Atty. Gen., Robert E. Lindsay, Deborah Dawson, Attys., Washington, D.C., for plaintiff-appellee.

Before KING[*] and DAVIS, Circuit Judges, and FELDMAN[**], District Judge.

FELDMAN, District Judge:

Jesse C. Powell was convicted on three counts of willfully attempting to evade federal income taxes under Title 26 of the United States Code, Section 7201. 26 U.S.C. § 7201 (1982). He was sentenced to two years in prison and a $15,000 fine. Powell appeals from the district court's denial of his suppression motion and his subsequent conviction. We affirm the district court.

## I. BACKGROUND

At the core of this appeal is the question whether this taxpayer was the subject of a criminal tax investigation under the guise of a civil audit.

On or about October 23, 1980, Revenue Agent Cindy Grove[1] of the Internal Revenue Service (IRS) began an audit of Powell's tax returns for the year 1978.[2] At the time of the investigation, Grove, a new revenue agent, was still in training, and Powell's was her first audit. The audit lasted some eleven months, until around September 21, 1981; and it included twenty-nine or thirty visits with Powell. At their first meeting, Grove informed Powell that the audit was a civil examination. Nonetheless, Powell asked if the examination was the "result of any kind of informant or something." Grove assured him that it was not. Powell did not specifically ask whether the examination was criminal in nature for another seven months, until April 27, 1982, when he was visited by Grove and IRS special agents.[3] At no time during Grove's audit was Powell represented by an attorney.

During the early part of her civil audit, Grove noticed unusually large deposits into Powell's bank account from something referred to as the "Executive IV Club." On April 22, 1981, in response to Grove's questions, Powell denied both that the payments were rent and that he owned the building in which the club was operated. He explained that the deposits were the result of his practice of occasionally cashing checks for the club. Grove felt these explanations were implausible in light of the low daily volume of cash on hand at Powell's hotel.[4]

On May 13 or 15, 1981, in an effort to make the pieces of Powell's tax puzzle fit, Grove contacted Floyd Morgan, the owner of the Executive IV Club. As a result of their meeting, Grove determined that the payments were, in fact, rent. Subsequently, on May 29, 1981, Grove and another revenue agent, Tim Whisneat, obtained cancelled rent checks from Morgan and an affidavit confirming that the amounts were paid as rent. Later that day the two revenue agents confronted Powell with the cancelled checks. Powell then conceded that the payments were rent, but stated that he had given the property and its rents to his children in trust. He added that he had simply failed to adhere to the legal requirements for establishing a trust. Grove was suspicious.

On June 1, 1981, feeling that the facts she obtained constituted a firm indication of fraud, Grove began preparing a fraud referral report to transfer the Powell investigation to the IRS's Criminal Investigation Division (CID).[5] Before completing the re-

---

[*] formerly Carolyn Dineen Randall

[**] District Judge for the Eastern District of Louisiana, sitting by designation.

1. Revenue agents are members of the Internal Revenue Service's Examination Division, and are responsible for civil tax audits.

2. Later in the investigation, Grove expanded the audit to include the years 1979 and 1980.

3. Special agents are members of the IRS's Criminal Investigation Division, and are responsible for criminal tax investigations.

4. According to Grove's testimony at the suppression hearing, she discovered deposits of $1,200.00 to $1,400.00 from the Executive IV Club. The daily cash volume of Powell's hotel was between $160.00 and $500.00. Furthermore, Grove found that Powell generally kept only $200.00 in cash on hand.

5. Section 4565.21 of the Internal Revenue Manual provides that, when a revenue agent discovers a "firm indication of fraud," she must immediately suspend her audit and file a fraud referral report, referring the case to the CID.

ferral papers, Grove discussed the case with her manager, Betty Olander, who recommended that she perform some additional independent tests for establishing income and advised her that the referral should be delayed pending the results.[6] Grove testified at the suppression hearing that she, in fact, did not have a firm indication of fraud as of the time that she performed the additional testing. She said, however, that "as a less than one year old Internal Revenue agent, I thought I might have a firm indication of fraud." In short, because of inexperience, she was unsure.

Grove met with Powell eighteen times between June 1, 1981 and September 21, 1981 in order to complete her additional testing (by a technique known as the indirect method of proving income). On September 2, 1981, Powell admitted to Grove that the rental income "was a problem." His story took on added nuances. He attempted to explain that the account into which the rents had been deposited belonged to his father-in-law. (His explanation about the account and the admission that the rent had not been reported were used against Powell at trial.) Subsequently, on September 21, 1981, Grove and Olander confronted Powell with the results of Grove's investigation. The information showed that Powell had spent more money than he had reported in his tax returns for the years 1978, 1979, and 1980. Powell conceded that the information was probably correct. Following this interview,

Olander told Grove to prepare a list of all of the badges of fraud discovered through September 21.[7] After reviewing the list, Olander then told Grove to prepare her fraud referral report.

Grove filed the report with the CID on October 31, 1981. It included three financial schedules prepared at the time of the uncompleted June 1, 1981 referral. The report also included the list of badges of fraud requested by Olander in September 1981 and the results of Grove's indirect income analysis. The CID took over the investigation in January of 1982. Grove admits that her interviews with Powell after June 1, 1981 led to new sources of income not otherwise discovered, gave her further access to Powell's personal records, and generally made her work more detailed. The information regarding new sources of income was ultimately introduced at trial. Powell did not receive his Miranda-type non-custodial warnings until April 27, 1982, when he was informed by special agents that he was under criminal investigation.[8] At the suppression hearing, in response to the Magistrate's questions, Powell stated that, if he had been given these warnings, he would have ceased to answer Grove's inquiries.

The district court adopted the Magistrate's finding that Grove's failure to refer the case to the CID on June 1, 1981 did not mislead Powell into believing that the inquiry was civil in nature rather than a

---

Internal Revenue Manual—Audit, § 4565.21, *reprinted in* II CCH IRM (Audit) at 8177–21. In the same section, the Manual provides that:

A firm indication of fraud must be distinguished from a first indication of fraud. A first indication of fraud can be described as a mere suspicion of fraud.... The determination of a firm indication of fraud is a factual determination which can only be determined on a case by case basis.

*Id.* Referrals, then, occur and are appropriate only upon a firm indication of fraud, not the first indication.

6. Among the analyses that Grove performed pursuant to Olander's suggestions was a cash transaction analysis of Powell's finances from 1978–1980. According to Grove, this analysis included layouts of all of Powell's available funds, including bank accounts, and all of his expenditures.

7. "Badges of fraud" are indicators listed in Section 940 of the Internal Revenue Manual, and are designed to aid revenue agents internally in determining whether a case should be referred to the CID. *See* Internal Revenue Manual—Audit, § 940, *reprinted in* II CCH IRM (Audit) at 7247–29, 30. As Powell notes, several of these badges of fraud had been identified prior to June 1, 1981.

8. Section 342.132 of the Internal Revenue Manual instructs special agents that they must inform subjects of investigation of the criminal nature of the inquiry and of their constitutional rights as subjects of a criminal investigation. Internal Revenue Manual—Criminal, § 342.132, *reprinted in* II CCH IRM (Criminal) at 298–2–85.

disguised criminal investigation. The district court found that the revenue agents made no affirmative misrepresentations to Powell and that the investigation was civil in nature until October 30, 1981. The court also found that Grove had not violated Internal Revenue Manual provisions requiring timely fraud referrals. These provisions, according to the court, established a procedure for filing a fraud referral at a time left to the discretion of the individual agent, and that such judgment is entitled to judicial deference unless the agent erred so egregiously as to render her actions as reflecting bad faith. Furthermore, the court held that the Manual provisions were administrative in nature, for internal IRS use only, and did not confer rights upon taxpayers. Finally, the court found that Grove's actions did not represent bad faith and that Powell was not prejudiced by any aspect of the investigation.

## II. ISSUES ON APPEAL

Powell raises three issues on appeal: 1) whether evidence discovered after June 1, 1981 was obtained through the "fraud, trickery, and deceit" of Internal Revenue agents; 2) whether that evidence was obtained through violations of certain provisions of the Internal Revenue Manual; and, 3) whether the evidence obtained should have been suppressed.

### A. Fraud, Trickery, and Deceit

It is elementary that evidence obtained through the "fraud, trickery, and deceit" of revenue agents is not admissible in criminal tax prosecutions. *See, e.g., United States v. Caldwell,* 820 F.2d 1395, 1399 (5th Cir. 1987); *United States v. Tweel,* 550 F.2d 297, 299 (5th Cir.1977). The *Tweel* court said that it "is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by deceit, trickery or misrepresentation of the Internal Revenue agent." *Tweel,* 550 F.2d at 299. Powell had the burden of establishing the agent's misconduct by clear and convincing evidence. *Caldwell,* 820 F.2d at 1399 (citing *United States v. Prudden,* 424 F.2d 1021, 1033

(5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970)). On appeal, our inquiry into the district court's resolution of this issue is governed by the clearly erroneous standard. *Caldwell,* 820 F.2d at 1399.

While we have addressed the issue of revenue agents' misrepresentations several times, we have only once held that suppression was appropriate. In *Tweel* the Organized Crime and Racketeering Section of the United States Department of Justice specifically requested that a revenue agent conduct an audit of the defendant's tax returns. The defendant's accountant actually asked the revenue agent whether or not a special agent was involved. An obviously sophisticated question. The *Tweel* panel found that the revenue agent's negative response to the question led the defendant and his accountant to believe that the investigation was purely civil in nature when, in fact, the case had criminal implications from the outset of the audit. We held that this response "grossly deceived" the defendant. Although the agent made no affirmative misrepresentation, we found that "[t]he silent misrepresentation was both intentionally misleading and material." 550 F.2d at 299.

In each of the other cases, we held that the defendants failed to show that the actions or omissions of revenue agents affronted the standards set forth in *Tweel.* In *Caldwell,* the CID learned of the defendant's activities through an informant, but was unwilling to open a criminal investigation with what it considered insufficient evidence of criminal fraud. 820 F.2d at 1397. After several months of investigation, the revenue agent assigned to the case prepared a fraud referral report, but after consulting his manager the agent decided that he lacked sufficient information to refer the case to the CID. *Id.* After another interview with the defendant and further investigation, the agent referred the case and, subsequently, the taxpayer was indicted for tax evasion. *Id.* at 1398. The taxpayer tried to suppress testimony concerning his last interview, claiming that this evidence was the product of a repre-

sentation that the investigation was still civil in nature, although it had really taken on criminal implications. The court first determined that the CID's initial involvement in the case did not make the investigation criminal in nature. Then, the court found that the district court was not clearly erroneous in determining that the revenue agents did not misrepresent the character of the investigation. We have reached similar conclusions in other cases. *See United States v. Miller,* 660 F.2d 563, 570 (5th Cir.1981); *United States v. Dawson,* 486 F.2d 1326, 1329 (5th Cir.1973); *United States v. Tonahill,* 430 F.2d 1042, 1044–45 (5th Cir.), *cert. denied,* 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247 (1970); *Prudden, supra,* 424 F.2d at 1032. They teach that the suppression burden is indeed a heavy one.

Powell contends that the revenue agents' actions in foregoing the June 1, 1981 fraud referral and continuing to pursue the civil audit amounted to a material misrepresentation of the nature of their investigation. He further asserts that his continued cooperation with them was in reliance upon their misrepresentation.[9] The district court adopted the Magistrate's conclusion that the agents' actions did not amount to misrepresentation.[10]

■ Powell concedes that in *Tweel,* unlike in the present case, the civil audit was initiated with criminal overtones. Its genesis implicated criminality. In that case, the court found that the civil investigation "was not a routine audit," but was in fact conducted "at the specific request of the Organized Crime and Racketeering Section of the Department of Justice." *Tweel,* 550 F.2d at 298. Unlike the audits in *Tweel*

and *Caldwell* the Powell audit was exclusively civil in nature throughout its duration.

Powell also asserts that Grove's lack of response to his inquiry, at the outset of the investigation, as to whether the investigation had been prompted by an informant, amounted to a material misrepresentation. This question could perhaps be interpreted as an inquiry into the civil or criminal nature of the case. It was unclear, at best. But, considering the time of the inquiry, October 23, 1980, it is certain that Grove had no reason to suspect criminal activity. Her response, then, was not misleading. In *Tweel,* clear criminal aspects anchored the investigation from the time it was referred from criminal law enforcement constituents in the Justice Department. And although Grove's audit grew into a criminal investigation, we have held that revenue agents have no duty to inform taxpayers that the agents' investigations might result in criminal charges. *Caldwell, supra,* 820 F.2d at 1399 (quoting *Prudden, supra,* 424 F.2d at 1033). Considering all of the evidence, we find no basis to hold that the district court's determination that the evidence obtained by agent Grove was not the product of fraud, trickery, or deceit is clearly erroneous.

## B. *Violations of the Manual Guidelines*

Powell claims that the district court erred in determining that the revenue agents did not violate certain guidelines in the Internal Revenue Manual. These guidelines instruct revenue agents that they must refer civil cases to the CID when

---

9. Powell testified at the suppression hearing that, had he known that the investigation had criminal overtones, he would have "quit talking" and "hired a lawyer...." Powell does not dispute, however, that he continued to cooperate with the investigation, even after special agents entered the case and advised him of the criminal potential of the investigation. His assertion of reliance has a hollow ring to it.

10. The Magistrate noted:
Here, the defendant [Powell] has not identified any representations which, if proved, would be affirmatively misleading. The de-

fendant's allegation, if correct, that the Internal Revenue Service agent represented her examination to be a "routine" civil audit did not constitute an affirmative misrepresentation; rather, the alleged misstatement was an accurate characterization of the examination.... Because the agent made no affirmative misrepresentations and because the examination was civil during the period complained of, June 1 to October 30, 1981, the defendant does not meet the requirements of *Tweel.*

a firm indication of fraud is discovered [11] and, more generally, that they must not conduct criminal investigations under the guise of civil audits.[12] Powell contends that the revenue agents did not comply with these provisions, and, as a result, violated Powell's Fifth Amendment due process right to have the IRS adhere to its published guidelines. Because of our determination that no Manual guidelines were violated in this case, it is unnecessary to decide whether or not these guidelines create a constitutionally protected right in the taxpayer.[13]

■ The Manual provision regarding disguised criminal examinations does not apply in this case because, as we have noted, Grove's examination was civil in nature throughout the relevant period. The remaining question is whether the agents involved violated Section 4565.21 by failing to file a fraud referral report on June 1, 1981, when Grove first considered referring the case. Our inquiry in this respect is controlled by the standards established in *Caldwell*, in which we stated that:

[T]he Audit Guidelines ... indicated that the referral decision was discretionary,

and no absolute criterion established when an investigation should be suspended and the case referred for a criminal investigation. The [*Groder*] court also distinguished between a firm indication of fraud and a first indication or mere suspicion that fraud existed, noting that, "If a firm indication is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as a matter of course, and 'the revenue agent would have to cease almost before he started his investigation.' "

*Caldwell*, 820 F.2d at 1402 (quoting *Groder*, 816 F.2d at 143).

Considering this deferential standard of inquiry, we hold that the district court was not clearly erroneous in accepting the Magistrate's finding that the revenue agents did not violate the internal IRS guidelines. There is sufficient evidence in the record to indicate that Grove and her manager, Olander, did not believe that enough evidence of fraud existed to refer the case until September 21, 1981, when the fraud referral report was filed.[14]

---

11. Powell points to Section 4565.21, which provides, in relevant part:

(1) If, during an examination, an examiner discovers a firm indication of fraud on the part of the taxpayer, the tax return preparer, or both, the examiner shall suspend his/her activities at the earliest opportunity without disclosing to the taxpayer, the taxpayer's representative, or employees, the reason for such suspension....

.   .   .   .   .

(3) There may be instances where, at the time the examiner discovers firm indications of fraud, the information available is insufficient to complete [the referral form] in all respects. Even so, the examiner will not delay preparing the report, but will complete it to the extent possible.
Internal Revenue Manual—Audit § 4565.21, *reprinted in* II CCH IRM (Audit) at 8177–21, 22.

12. Section 9311.83 provides, in part:

(1) The Tweel case (*U.S. v. Tweel*, 55[0] F.2d 297 (5th Cir.1977)) very clearly points out that the Service should not attempt to use a civil investigation to develop a criminal tax case. If a criminal case is being developed with regard to a taxpayer, the Service must respect the taxpayer's rights and follow Manual instructions pertaining thereto. Therefore, under no circumstances will these proce-

dures be used to develop a criminal tax case under the guise of a civil examination.
Internal Revenue Manual—Administration § 9311.83, *reprinted in* CCH IRM (Administration) at 28,075–5.

13. While we need not address this issue, it has been confronted by several courts. Most recently, the Fourth Circuit noted that Section 4565.-21, *see, supra,* note 11, "confers no substantive rights or privileges upon taxpayers." *Groder v. United States,* 816 F.2d 139, 142 (4th Cir.1987). *Accord United States v. Kaatz,* 705 F.2d 1237, 1243 (10th Cir.1983); *United States v. Mapp,* 561 F.2d 685, 690.(7th Cir.1977); *United States v. Lockyer,* 448 F.2d 417, 420–21 (10th Cir.1971). The only exception to this line of holdings is *United States v. Toussaint,* 456 F.Supp. 1069 (S.D.Tex.1978), in which the district court held that a predecessor of Section 4565.21 did confer substantive rights upon taxpayers. In *Caldwell,* we expressly avoided deciding the issue. *See Caldwell, supra,* 820 F.2d at 1401.

14. Grove testified at the suppression hearing regarding Olander's decision to defer the June 1 filing of the fraud referral:

Q All right. Why wasn't a referral made on June the 1st?
A She didn't feel that I had a firm indication of fraud at this time.

Powell maintains that Grove, in deferring to her manager's determination that a fraud referral on June 1 would have been premature, failed to comply with the Manual's instructions that she refer the case as soon as she determined that a firm indication of fraud existed. Considering Grove's inexperience at the time, we do not find that her deference to Olander's opinion violated the guidelines. The Manual teaches caution to agents. We note that Section 4565.21 instructs an agent who is in doubt about the timing of a fraud referral to "consult with his/her group manager ... to determine if the indicators of fraud are sufficiently developed." [15] We view the careful approach of the Manual as a wise and praiseworthy safeguard against the whimsical disregard of taxpayers' rights by decisions of agents who, through inexperience, might otherwise act too quickly or impetuously.

In this case, where a revenue agent of less than one full year's experience began preparation of a fraud referral report, but then deferred to her manager's determination that such a referral was premature, we find the district court's conclusion that no violation of the Manual occurred is not clearly erroneous.

Although we note, as we did in *Caldwell,* that the decision as to when to refer a case to the CID is generally left to the discretion of the revenue agents involved, we do not insinuate that courts should be casual about claims that the IRS disguised a criminal investigation as a civil audit. The IRS is limited by the clear standards of *Tweel,* which we reassert today. We will not countenance fraud, trickery, or deceit in the conduct of tax investigations. But *Tweel* does not help Powell.

We AFFIRM the district court.

Q  Did she tell you that she felt that you had some suspicions but not a firm indication?
A  That's right.
Q  Did she tell you that you would need more evidence of intent before you had a firm indication of fraud?
A  That's right. She wanted me to—first of all, in reviewing the case, I had never done the indirect method, which I initially planned to do when I first opened the case, and that was part of what she wanted me to do before I could refer the case in an attempt to make sure I wasn't making a mistake.
Q  And so between June the 1st and September the 21st, you had the several meetings with Mr. Powell that you have testified to today. Is that correct?
A  That's right.
Q  And when you went to meet with Mr. Powell on September the 21st, Betty Olander you testified was with you.

A  Umhmm.
Q  After that, did you have a conversation with her about whether the point had been reached where you had a firm indication of fraud?
A  Yeah. She had me list all the badges of fraud that I now had, and put—and after reviewing those, she decided that, yes, we should go ahead and make this referral.
At the suppression hearing, Powell's attorney objected to this testimony on hearsay grounds. The Magistrate overruled the objection, and Powell did not raise the issue with the district court or in this appeal.

15. In *Caldwell, supra,* the decision to defer the filing of a fraud referral report was made after the revenue agent conferred with his manager. *See* 820 F.2d at 1397.