**UNITED STATES of America, Plaintiff,**

v.

**Florence L. PETERS, Defendant.**

**No. 95 CR 0216.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 21, 1996.

Harvey M. Silets, Ross O. Silverman, Katten, Muchin & Zavis, Chicago, IL, Cynthia Louise Giacchetti, Law Offices of Cynthia Giacchetti, Chicago, IL, David V. Capes, Rosenblum, Goldenhersh, Silverstein & Zafft, P.C., St. Louis, MO, for Florence L. Peters.

Asst. U.S. Atty., United States Attorney's Office, Chicago, IL, for U.S.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Defendant, Dr. Florence L. Peters, is the subject of a five count indictment for tax fraud. She now moves to suppress records and statements that she offered to IRS auditors in the months between April, 1990 and January, 1992. Dr. Peters claims that the IRS obtained this evidence in violation of her Fourth and Fifth Amendment rights by telling her that they were conducting a routine civil audit when in fact they were carrying out a criminal investigation. For the reasons set forth below, defendant's motion to suppress is denied.

### Tax Investigations

This case unmasks the investigative techniques employed by the Internal Revenue Service. Its principle players are the Criminal Investigation Division and the Examination Division of the IRS, two organizations charged with enforcing the nation's tax laws.

A brief introduction to these institutions sets the stage for the factual recitals to follow.

As its name suggests, the Criminal Investigation Division (CID) ferrets out criminal violations of the tax code and related federal statutes. A criminal tax offense generally entails a substantial level of underpayment paired with some intent to defraud the government. *See* 26 U.S.C. § 7201 *et seq.* Due to the nature of its investigations, the CID wears the raiments of a criminal law enforcement agency. CID operatives are called special agents, and they carry guns and badges. Moreover, special agents must read the following administrative warning before they solicit information from taxpayers:

As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.... [U]nder the Fifth Amendment of the Constitution of the United States I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any information which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding.

*Beckwith v. United States*, 425 U.S. 341, 343, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1 (1976), *quoting* IRS News Release No. 897 (1967) and IRS News Release IR–949 (1968). All of this regalia is occasioned by the fact that the subject of a CID investigation may end up in jail.

The Examination Division of the IRS is responsible for conducting civil tax audits. A civil audit is an investigative procedure used to determine whether an individual has paid all of his or her taxes. *Cohen v. United States*, 405 F.2d 34, 35 n. 3 (8th Cir.1968). When an audit reveals evidence of underpayment, the IRS generally enters a civil settlement with the taxpayer consisting of repayment and possible monetary penalties. For this reason, the Examination Division does not present itself as a criminal law enforcement agency. Civil audits are con-

ducted by revenue agents, who, unlike special agents, do not carry guns and are not required to provide administrative warnings. *United States v. Tweel,* 550 F.2d 297, 299–300 (5th Cir.1977) (only special agents are required to provide administrative warnings); *United States v. Piper,* 681 F.Supp. 833, 839 (M.D.Ga.1988) ("[R]evenue agents, unlike special agents, have no duty either to provide Miranda-like warnings or to advise taxpayers that a routine civil audit may lead to criminal proceedings").

■ The functional distinction between the CID and the Examination Division blurs, however, when it is considered that a civil audit may produce sufficient evidence of criminal activity to send a person to prison. *Piper,* 681 F.Supp. at 838 ("[A] routine civil audit may in any situation lead to criminal proceedings"). The Examination Division may refer a case to the CID for a criminal investigation whenever it uncovers firm indications of fraud by the taxpayer. The IRS regulations provide that

> [i]f, during an examination, an examiner discovers a firm indication of fraud on the part of the taxpayer, the tax return preparer, or both, the examiner shall suspend his/her activities at the earliest opportunity without disclosing to the taxpayer ... the reason for such suspension.

Internal Revenue Manual § 4565.21(1) (hereinafter IRM); *see also Piper,* 681 F.Supp. at 838 ("[A] civil examination should be halted upon a finding of 'firm indications of fraud' "). When this occurs, the taxpayer cannot escape criminal sanctions by offering to repay his or her debt.

Statistically, civil audits lead to criminal prosecutions in only a very small number of cases each year. In 1994, the IRS audited only about 1.25 million of the 114.88 million individual returns filed. U.S. Department of Treasury, Internal Revenue Service, *Data Book 1993–1994* 89, 96 (1995). In that same year, the CID initiated 5,346 criminal investigations, and these resulted in 3,130 criminal convictions. *Id.* at 103. In 1989, only about 19 percent of the CID investigations began with referrals from other divisions of the IRS, although this number was as high as 50 percent in 1978. Michael I. Saltzman, *IRS*

*Practice and Procedure* 12–9 (1991). These figures suggest that, while the Examination Division does not function primarily as a criminal law enforcement agency, there are some cases where it does. Indeed, this is one such case.

■ The Internal Revenue Manual distinguishes a "firm indication" from a "first indication" or "mere suspicion" of fraud. IRM § 4565.21(1); *see also Groder v. United States,* 816 F.2d 139, 143 (4th Cir.1987), and *Piper,* 681 F.Supp. at 838. The purpose of this rule is to permit revenue agents to substantiate or "perfect" preliminary indications of fraud by ruling out, through an audit, possible innocent explanations for faulty returns. *See United States v. Caldwell,* 820 F.2d 1395, 1402–1403 (5th Cir.1987) (firm indications rule permits agents "to develop the case in sufficient detail to be sure there is not an innocent explanation for unreported income and to develop the case sufficiently to allow CID to determine whether a criminal investigation is warranted"); *United States v. Kaatz,* 705 F.2d 1237, 1243 (10th Cir.1983) (revenue agent need not refer case to CID in the face of unanswered questions); *Piper,* 681 F.Supp. at 838 (Examination Division must "preclude innocent explanation for unreported income" before referring to CID); *see also* Saltzman at 12–10 (revenue agents perfect indications of fraud by "examining books and records that may later be unavailable to the IRS").

The Seventh Circuit described the firm indications rule in *United States v. Mapp,* where it held that

> while a revenue agent might know of fraud, he must still, in his discretion, decide when the investigation has progressed to the point at which he has enough information so that the Intelligence Division can make an informed decision on whether or not to undertake a criminal investigation.

561 F.2d 685, 690 (7th Cir.1977). In *Groder,* the Fourth Circuit explained the reasoning behind the rule as follows:

> If a firm indication is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as

a matter of course, and the revenue agent would have to cease almost before he started his investigation.

816 F.2d at 143 (quotations omitted); *accord Caldwell*, 820 F.2d at 1402, *United States v. Powell*, 835 F.2d 1095, 1100 (5th Cir.1988), and *Piper*, 681 F.Supp. at 838.

■ The question of whether certain evidence constitutes a firm indication of fraud is "a factual determination which can only be [made] on a case by case basis." IRM § 4565.21(1). In making this determination, revenue agents must look to the so-called "badges of fraud" listed in the Internal Revenue Manual. IRM § 940; *see also Powell*, 835 F.2d at 1097 n. 7. The decision that certain "badges of fraud" constitute a firm indication of fraud is almost exclusively within the discretion of the supervisory Examination Division personnel. *See Mapp*, 561 F.2d at 690 (evaluation of evidence underlying fraud referral is discretionary); *Powell*, 835 F.2d at 1100–1101 (timing of fraud referral under IRM § 4565.21 is discretionary and requires a revenue agent to "consult with his/her group manager ... to determine if the indicators of fraud are sufficiently developed"), *Caldwell*, 820 F.2d at 1402 (referral to CID is discretionary and there are "no absolute criterion established for when an investigation should be suspended and the case referred for criminal investigation"), *Groder*, 816 F.2d at 143 (timing of CID referral is discretionary), and *Piper*, 681 F.Supp. at 838 ("[T]he decision to refer a matter from the civil division to the CID is a discretionary one").

In addition to being referred by the Examination Division or some other agency in the IRS, a criminal tax investigation may be prompted by an information item or "tip" from another law enforcement agency or from the public. The IRS receives up to 200,000 information items each year. Saltzman at 12–12. Of these, however, only a very small number develop into fraud investigations; most do not contain sufficient evidence to justify a full-scale criminal investigation. Saltzman at 12–15. Despite the fact that very few information items develop into criminal investigations, the IRS encourages the public to submit such information items directly to the CID. *United States v. Robson*, 477 F.2d 13, 17 (9th Cir.1973) ("Every informant's tip received by the IRS comes through the [CID, yet] not every tip results in an investigation").

Upon receiving an information item, the CID reviews it and determines whether it should be retained for a criminal investigation or referred for a civil tax audit. *See generally* IRM § 9311; *see also* Saltzman at 12–12. If the CID decides to retain a case, it may initiate a full investigation or assign the case to a special agent for a limited primary investigation. IRM §§ 9311.2, 9311.3(2); *see also* Saltzman at 12–20 to 12–21. If, however, the CID determines that a case has a "firm indication of substantial civil tax potential" but has no criminal potential, then it may refer the case to the Examination Division for a civil tax audit. IRM § 9311.83(2); *see also* Saltzman at 12–21.

In this case, IRS officials testified that information items trigger immediate criminal investigations only very rarely, as they are usually routed to the Examination Division for civil audits. The CID generally retains information items only when it has a preexisting case file on the taxpayer or some other special interest in the case. Once an information items reaches the Examination Division, it may be disregarded if it does not promise a significant tax recovery.

Prior to every civil audit, the IRS gives the taxpayer two documents that are of particular relevance here. The first, which is entitled "Your Rights as a Taxpayer," informs taxpayers that they have the right "to know why we are asking you for information, exactly how we will use any information you give, and what might happen if you do not give information." Department of Treasury, Internal Revenue Service, Publication 1, "Your Rights as a Taxpayer," ¶ 9 (June 1989). It explains that taxpayers may be represented by an attorney. *Id.* at ¶ 13. It further represents that "[w]henever you owe tax ... [w]e will not take any enforcement action ... until after we have tried to contact you and given you the chance to voluntarily pay any tax due." *Id.* at ¶¶ 18, 26.

The second document, the Privacy Act Notice, includes the following statement warn-

ing taxpayers about the possibility of criminal prosecution:

> If you do not file a return, do not provide the information we ask for, or provide fraudulent information, the law says that you may be charged penalties and, in certain cases, you may be subject to criminal prosecution.

Department of the Treasury, Internal Revenue Service, "Notice 609: Privacy Act Notice," ¶ 7 (June 1989). The publication also notifies the taxpayer that the information collected in a civil audit may be shared with the Department of Justice, as well as with other federal, state, and municipal agencies. *Id.* at ¶ 6.

### Factual Background

The tax investigation of Dr. Peters began in 1988, when her ex-husband Marshall Peters placed a telephone call to the IRS to report her allegedly improper tax reporting practices. The call was received by Special Agent Gerald Padar of the CID, who set up an appointment to meet personally with Mr. Peters on October 6, 1988. After the meeting, Mr. Peters sent Padar photocopies of over 500 checks that defendant allegedly wrote for personal expenses but deducted as business expenses.

In Padar's estimation, this information amounted to nothing more than an "unsubstantiated allegation of fraud" which did not warrant a full criminal investigation. For almost eighteen months, then, Padar did nothing to pursue an investigation beyond reading over the documents provided by Mr. Peters and conducting a single drive-by surveillance of defendant's home. He neither opened an official case file nor contacted defendant personally. Padar later explained that he was reticent to launch an investigation because there were numerous reasons why defendant's allegedly improper expenses might prove to be legitimate, and also because the origin of the tip cast some doubt on its veracity. Padar ultimately carried the Peters file across the hall to the Examination Division when the IRS moved its offices in January or February of 1990. He had no further connection with the case.

The file then fell into the hands of Thomas Ridgeway, a group manager in the Examination Division. Like Padar, Ridgeway did not regard the information provided by Mr. Peters to constitute a firm indication of fraud. Rather, he characterized the file as "unsubstantiated paper" and "300 pages of nothing." He did, however, determine that the case promised a sufficient tax recovery to merit a civil audit.

In March or April of 1990, then, Ridgeway assigned the case to an inexperienced revenue agent named Margo Thompson, who reviewed the CID file and initiated a civil audit. Thompson was aware that the case had been prompted by an information item and referred by the CID. She did not, however, have any contact with the CID during the course of the audit. Like Padar and Ridgeway before her, Thompson did not see anything in the file which she construed as a firm indication of fraud. She had, in fact, worked with other cases that were prompted by information items but did not evolve into criminal investigations.

Thompson initiated the first IRS contact with Dr. Peters on July 2, 1990. On that date, Thompson sent a standard form letter to Dr. Peters indicating that defendant's 1987 and 1988 corporate tax returns had been selected for a civil audit. Enclosed in the letter were the Privacy Act Notice and the document entitled "My Rights as a Taxpayer." The letter contained no indication that the audit had been prompted by an information item or that the case had been referred by the CID.

Commencing in September of 1990, Thompson conducted a series of personal meetings and telephone contacts with William Morrison, an accountant and tax expert who had worked with Dr. Peters for almost ten years. Thompson first met with Dr. Peters for approximately two hours on November 5, 1990, shortly after finding an apparent discrepancy of approximately $100,000 in her tax filings. At this time, Thompson did not believe that she had gathered sufficient evidence to constitute a firm indication of fraud. As of February, 1991, Morrison himself did not have any indication that the case might have criminal potential.

In the course of these communications, Morrison testified, he asked Thompson whether she was conducting a "routine" or "ordinary" audit, and she replied in the affirmative. Beyond this, Thompson never revealed to defendant or her agents that the audit had been prompted by an information item or referred by the CID. Nor did she provide a verbal warning that defendant might be subject to criminal prosecution. Morrison testified that he would have discontinued the audit and advised his client to retain an attorney if he had known any of these facts during the fall of 1990.

In April, 1991, Thompson concluded her audit and began to compose a fraud referral. The following month, however, she reviewed the case with her new supervisor Bruce Wilson, and he concluded that the audit contained too many procedural errors to substantiate a fraud referral. In particular, Wilson believed that Thompson had disallowed certain classes of deductions without investigating whether Dr. Peters could explain them and, as a result, that the IRS was obliged to reexamine defendant's expenses de novo. In short, Wilson decided that Thompson's papers "proved nothing." Although Wilson was unwilling to make a fraud referral, he nevertheless believed that Thompson's analysis had uncovered preliminary indications of fraud that should be followed up with a bank deposit analysis.

The cast of characters broadened in July of 1991, when defendant retained the services of an attorney named Ben Roth and the Examination Division reassigned the audit to Revenue Agents Cynthia Lensink (then Geronome) and Steven Mittl. Lensink met personally with both Morrison and Roth on November 4, 1991. During that meeting, Roth advised his client to sign a consent form extending the window of time in which the IRS might settle or prosecute the case. Revenue Agent Lensink stated that she wished to close the audit expeditiously and had prepared a list of proposed "adjustments" for that purpose, statements which both Roth and Morrison interpreted as referring to a civil settlement rather than to a criminal prosecution. Lensink said nothing to indicate that Thompson had prepared an abortive fraud referral, that the audit had been prompted by an information item, or that the case had originated with the CID.

Roth testified that he asked Lensink during the meeting on November 4, 1991, whether the case might be referred for criminal prosecution, and that she replied in the negative. Lensink, however, testified that Roth never asked her this question and that she never denied the possibility of criminal prosecution. In support of her testimony, Lensink produced exhaustive notes of the meeting on November 4th, notes which made no reference to this very significant interchange.

Regardless of the status of the investigation on November 4, 1991, the Examination Division had a firm indication of fraud by the end of December, when it referred the case to the CID for a criminal investigation. Morrison and Roth first learned of the referral in January of 1992. The CID ultimately recommended criminal prosecution of defendant based on the information that she provided to the IRS during her audit. The instant five-count indictment ensued.

Defendant now alleges that the government tricked her into believing that the audit was exclusively civil in nature when in fact it was at all times a criminal investigation. She further claims that the government fraudulently induced her cooperation in the audit by failing to warn her that it had been prompted by an information item and might lead to criminal sanctions. Consequently, she argues, the evidence obtained through her audit must be suppressed.

The court conducted a suppression hearing that stretched over six trial days. After thoroughly reviewing the testimony and pleadings offered by the parties, together with the relevant case law, the court now denies defendant's motion to suppress.

*Discussion*

■ In 1921, the Supreme Court explained that the Fourth and Fifth Amendments require the suppression of evidence obtained by government agents through "stealth." *Gouled v. United States,* 255 U.S. 298, 305–306, 41 S.Ct. 261, 263–64, 65 L.Ed. 647 (1921). This rule bars the use of evidence

obtained in a consensual IRS audit "if the consent was induced by deceit, trickery, or misrepresentation." *Tweel,* 550 F.2d 297; *accord Powell,* 835 F.2d at 1098, *Caldwell,* 820 F.2d at 1399, *Cardwell v. Kurtz,* 765 F.2d 776, 780 (9th Cir.1985), and *Robson,* 477 F.2d at 17; *but see Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), and *United States v. Walker,* 760 F.2d 144, 146 (7th Cir.1985) (allowing undercover agents to make misrepresentations).

■ In order to prevail on her motion, defendant must show by clear and convincing evidence that the agents "affirmatively misled [her] as to the true nature of the investigation" and that the misinformation was "material in [her] decision to speak with the agents." *United States v. Serlin,* 707 F.2d 953, 956–957 (7th Cir.1983); *accord United States v. Stern,* 858 F.2d 1241, 1249 (7th Cir.1988), *Caldwell,* 820 F.2d at 1399, *United States v. Grunewald,* 987 F.2d 531, 534 (8th Cir.1993), and *United States v. Wuagneux,* 683 F.2d 1343, 1347 (11th Cir.1987). In the end, however, the court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Beckwith,* 425 U.S. at 348, 96 S.Ct. at 1617, *cited Serlin,* 707 F.2d at 956, and *Mapp,* 561 F.2d at 688. In any case, the "remedy [of suppression] is suggested only for fairly serious affirmative [mis]representations," *United States v. Irvine,* 699 F.2d 43, 45 (1st Cir.1983), and "the suppression burden is indeed a heavy one," *Powell,* 835 F.2d at 1099.

As a threshold matter, then, the court must decide whether the civil revenue agents affirmatively misrepresented the nature of their investigation to Dr. Peters. To do this, the court must consider, first, whether the civil audit conducted by the revenue agents was in fact a covert criminal investigation; second, whether the agents had a duty to warn defendant that the audit might result in criminal penalties; and, third, whether the agents had a duty to reveal that the audit was prompted by an information item.

## A.

■ Defendant contends that the revenue agents affirmatively misrepresented that they were conducting a routine civil audit when in fact they were engaged in a criminal investigation. It is well established that an "affirmative representation by an IRS agent that [an] investigation is routine when in fact it is a criminal investigation requires suppression of evidence." *United States v. Nuth,* 605 F.2d 229, 234 (6th Cir.1979); *accord Serlin,* 707 F.2d at 957. The purpose of this rule is to prevent the IRS from developing a criminal investigation under the guise of a civil audit. IRM § 9311.83.

The leading authority in this arena is *Tweel,* 550 F.2d 297. In that case, the Fifth Circuit required revenue agents to disclose, when asked, that their audit was ordered by the Justice Department in conjunction with an ongoing criminal investigation of the taxpayer. *Id.* at 298. In an attempt to discern whether the audit was part of a criminal investigation, the defendant's accountant asked the revenue agents whether a special agent was assigned to the case. *Id.* Although the auditors answered literally that there were no special agents involved, the court characterized their response as a "sneaky deliberate deception" and a "flagrant disregard for [the defendant's] rights." *Id.* at 298–299. It denounced the agents' conduct as a "shocking" violation of the "good faith ... [that] the taxpayers should be able to expect ... from the government in its enforcement and collection activities." *Id.* at 300.

■ In this case, there is uncontroverted evidence that the revenue agents characterized their investigation as an ordinary or routine civil audit. The very first communication that defendant received from the government was a standard form letter dated July 2, 1990, indicating that she had been selected for a civil audit. In the course of the investigation, Revenue Agent Thompson told Morrison that she was indeed engaged in a routine civil audit. Later, during the summer and fall of 1991, Revenue Agent Lensink informed Morrison and Roth she wished to close the audit expeditiously and had prepared proposed "adjustments" to that end. Both Roth and Morrison believed that

Lensink was referring to a civil settlement rather than to criminal prosecution.

In order to determine whether these communications were affirmative misrepresentations of the type prohibited by *Tweel*, the court must decide whether the revenue agents were in fact conducting a criminal investigation. It has been shown that a civil audit evolves into a criminal investigation at the point when the auditors develop a firm indication of fraud. Under this rule, the court must find that the revenue agents were engaged in a covert criminal investigation if they continued to audit defendant after they developed a firm indication of fraud.

In this case, there is insufficient evidence to support the conclusion that the revenue agents had a firm indication of fraud prior to the completion of their fraud referral. *See, e.g.*, IRM § 4565.21(1); *Piper*, 681 F.Supp. at 838. First, the fact that the investigation was prompted by an information item does not, by itself, establish a firm indication of fraud. The IRS routinely channels public information items to the CID without making any preliminary evaluation of their probable merit. Because many of these tips ultimately prove to be frivolous, it would be impractical for the CID to launch full-scale criminal investigations into each of the thousands of information items that it receives each year.

Second, it is apparent that the particular information items that Mr. Peters furnished to Special Agent Padar did not constitute a firm indication of fraud. While the information was sufficiently compelling to prevent Padar from disposing of the file altogether, it certainly did not capture his immediate attention. In fact, Padar did nothing to pursue the case over the next eighteen months but drive by defendant's house exactly one time. The fact that he waited until the IRS moved its offices to carry the case file across the hall to the Examination Division suggests that the transfer may have had more to do with routine housecleaning than with a calculated attempt to use a civil audit as a front for a criminal investigation. This conclusion is further supported by the fact that the CID relinquished all connection with the case after transferring it to the Examination Division. For these reasons, the court cannot accept that the CID had a firm indication of fraud prior to the time that it transferred the Peters file to the Examination Division.

Third, the Examination Division did not act improperly by continuing its audit of Dr. Peters after Revenue Agent Thompson initiated her fraud referral in the spring of 1991. Bruce Wilson, Thompson's immediate supervisor at that time, explained that the audit continued because Thompson's work contained significant errors which rendered the initial fraud referral defective. This explanation closely resembles that which the Fifth Circuit accepted in *Powell*, 835 F.2d at 1096–1097, where the Examination Division continued an audit in the face of a faulty fraud referral prepared by an inexperienced revenue agent. The court accepts this explanation for why the audit continued after Thompson initiated her fraud referral in May of 1991.

Fourth, and finally, there is no reason to believe that Revenue Agents Lensink and Mittl developed a firm indication of fraud at any point before they initiated their fraud referral in December of 1991. The IRS would not have needed to seek consent to extend its investigation on November 4, 1991, if it already had enough evidence to refer the case to the CID. More significantly, however, the firm indications rule confers broad discretion on the Examination Division to decide exactly how much evidence is necessary to substantiate a fraud referral. Defendant has presented insufficient evidence to support her contention that the Examination Division abused this discretion by collecting more information during the fall of 1991 than it needed to substantiate a fraud referral.

The court therefore finds that, under the "firm indications rule," the revenue agents were not engaged in a covert criminal investigation of defendant. This conclusion is amply supported by existing case law. In *Caldwell*, 820 F.2d at 1400, the Fifth Circuit held that a civil audit did not constitute a criminal investigation merely because it was prompted by an information item and referred to the Examination Division from the CID. The court decided that the information item did not constitute distinct evidence of fraud per se and thus did not require a full CID

investigation. *Id.* at 1397, 1400. It therefore rejected the argument that the civil audit was nothing more than a clandestine criminal investigation by the CID. *Id.* at 1400.

Similarly, in *Piper*, 681 F.Supp. 833, the court held that a revenue agent properly characterized an audit as "routine" even though it had been prompted by a tip from an informant and referred by the CID. The CID had reviewed the information item, determined that the case lacked criminal potential, and referred it to the Examination Division for an audit. *Id.* at 838. Upon discovering firm indications of fraud, however, the Examination Division referred the case back to the CID. *Id.* The court held that the audit was not a criminal investigation prior to the fraud referral because "the decision to refer a matter from the civil division to the CID is a discretionary one." *Id.* at 838–839.

*Tweel* does not require a contrary result. In that case, the court held that a revenue agent may not characterize an audit as routine if the taxpayer is the subject of a concurrent criminal investigation by the IRS or some other law enforcement agency. Here, however, the Examination Division had no firm indication of fraud prior to making its fraud referral in December of 1991. Moreover, there is no evidence that the CID or any other law enforcement agency was conducting a criminal investigation in conjunction with the civil audit. Thus, the revenue agents properly characterized their investigation as a routine civil audit.

While the court is compelled to reach this conclusion on the basis of the prevailing "firm indications" rule, it nevertheless has grave reservations about relying exclusively on this rule to determine whether a criminal investigation is in progress. The court perceives that the "firm indications" rule suffers from two significant flaws. First, the Examination Division uses the term "firm indication of fraud" merely to describe the quantum of evidence that it needs to transfer a case to the CID. Thus, Revenue Agent Margo Thompson testified that her group manager had exclusive authority to determine what evidence constitutes a firm indication of fraud. Then Bruce Wilson, a supervisor in the Examination Division, testified that "a firm indication of fraud is when I, as group manager, sign the fraud referral form." Unless the term "firm indication of fraud" is defined in relation to fixed evidentiary criteria, however, its meaning evaporates in circularity. In its current usage, the term is a classic example of bureaucratic double-talk and improperly shields the fraud referral process from judicial scrutiny.

Second, the "firm indication" rule supports a bifurcated system of tax enforcement which is based on the assumption that a civil audit is not really a criminal investigation. This assumption is simply erroneous. Although the vast majority of civil audits do not lead to criminal prosecutions, some do. To argue that the subject of a civil audit should be denied the same constitutional protections afforded to the subject of a CID investigation is analogous to arguing that the subject of a police stop should be denied constitutional protections because most such stops do not lead to criminal prosecution. If the evidence gathered in a civil audit may be used in a criminal prosecution, then the civil audit is part of a criminal investigation. The "firm indications rule" is at best a permeable and at worst an invisible barrier between the civil and criminal investigative functions of the IRS.

To the extent that the current rule hangs on a formalistic distinction between civil and criminal tax investigations, it invites the IRS to engage in "constructive dishonesty" with the taxpayer. The court finds this result highly disturbing for the reason that

> a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. [It is] clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.

*S.E.C. v. ESM Government Securities, Inc.*, 645 F.2d 310, 316 (5th Cir. Unit B 1981). Under the prevailing "firm indications" rule, however, the court must conclude that Revenue Agents Thompson and Lensink did not affirmatively misrepresent their inquiry by describing it as routine civil audit.

## B.

Defendant suggests that the revenue agents breached an affirmative duty to warn her that their audit might lead to criminal sanctions. It is well established that revenue agents have no duty to provide *Miranda* warnings to taxpayers in non-custodial interviews. *Beckwith*, 425 U.S. 341, 96 S.Ct. 1612. Nevertheless, "revenue agents must not affirmatively mislead a taxpayer into believing that [an] investigation is exclusively civil in nature and will not lead to criminal consequences." *United States v. Lehman*, 468 F.2d 93, 105 (7th Cir.1971); *see also Mapp*, 561 F.2d at 689, *United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.1970), *Cohen*, 405 F.2d at 36, and *Robson*, 477 F.2d 13, 15 (9th Cir.1973).

Revenue agents do not, however, have an affirmative duty to disclose that an audit might result in criminal charges unless they are asked. *See Serlin*, 707 F.2d at 956 ("failure to inform defendant that ... the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agent's failure to respond was intended to mislead"); *Powell*, 835 F.2d at 1099 ("[R]evenue agents have no duty to inform taxpayers that the agents' investigations might result in criminal charges"); *Lehman*, 468 F.2d at 105 (no misrepresentation where revenue agents said nothing regarding criminal liability and defendant made no inquiries); *Robson*, 477 F.2d at 18 (revenue agents have "no duty to mention the possible criminal consequences of [an] audit" if they are "[n]ever queried as to the scope of [their] investigation"); *Kaatz*, 705 F.2d at 1243 ("[f]ailure to warn that a criminal investigation may ensue is not fraud, deceit, or trickery").

The Fifth Circuit held in *Prudden* that the "mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do[es] not constitute ... deceit." 424 F.2d at 1033. *Accord Powell*, 835 F.2d at 1099; *Caldwell*, 820 F.2d at 1399; *Robson*, 477 F.2d at 17–18. The court reasoned that "silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading." *Prudden*, 424 F.2d at 1032. Nevertheless, it concluded that auditors have no duty to explain the potential criminal results of a civil audit because "the warning at the bottom of every tax form" provides adequate notice of potential criminal liability. *Id.* at 1034.

The Second Circuit adopted a similar position in *United States v. Squeri*, 398 F.2d 785, 788 (2d Cir.1968), where it asserted that the mere fact of an audit should be sufficient to confer notice of potential criminal liability. The court held that "[t]he information that a taxpayer's returns are under audit gives notice of the possibility of criminal prosecution regardless of whether the agents contemplate civil or criminal action when they speak to him." *Cited with approval Prudden*, 424 F.2d at 1033 n. 26.

Applying this rule to criminal investigations, the First Circuit held in *Irvine* that two special agents of the CID did not misrepresent their investigation by failing to mention that the defendant was the subject of a criminal investigation. 699 F.2d at 45. The court indicated that "[n]o case holds that an IRS agent breaches a constitutional duty when he obtains information merely by failing to state specifically that he is conducting a criminal investigation." *Id.* at 46.

As noted above, the only conceivable circumstance under which an auditor may have a duty to reveal the possibility of criminal liability is in response to a direct question from the taxpayer. There is no credible evidence in this case, however, that defendant or her agents ever asked the auditors whether the investigation might lead to criminal charges. It is therefore unnecessary for the court to decide whether the warning of potential criminal liability contained in the

Privacy Act Notice was sufficient to discharge this contingent duty to warn. The court concludes, then, that the revenue agents did not have a duty to inform defendant that their audit might lead to criminal charges.

### C.

 Finally, defendant suggests that the IRS breached a duty to inform her that the audit was prompted by an information item. It is clear, however, that no such duty exists. *See United States v. Meier,* 607 F.2d 215, 216–217 (8th Cir.1979) (agent's silence in response to inquiry about whether audit was prompted by informant was not misleading), *Robson,* 477 F.2d at 17 (revenue agent has no duty to disclose that the purpose of an audit is to verify information rendered by an informant), and *Cardwell,* 765 F.2d at 780 (same).

Rather, IRS regulations prevent revenue agents from revealing that an audit was prompted by an information item. The Internal Revenue Code prohibits the IRS from disclosing "any return or return information" that "would identify a confidential informant." 26 U.S.C. § 6103(i)(6). Similarly, the Internal Revenue Manual provides that

> [t]he source of information when furnished by informants or other confidential sources, [the] identity of any informants, and [the] methods of obtaining information will not be divulged to the taxpayer under investigation or other unauthorized persons.

IRM § 9373.1(1). When a taxpayer asks an agent directly whether a particular audit was prompted by an information item, then, the revenue agent must respond that he or she is not permitted to answer that question. These rules, together with the cases cited above, clearly establish that the IRS did not affirmatively mislead defendant by failing to explain the genesis of its investigation.

ORDERED: Defendant, Dr. Florence L. Peters' motion to suppress is denied.